**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED APRIL 5, 2006

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v

No. 127194

JOHN ALBERT GILLIS,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether our state's first-degree murder statute permits a felony-murder conviction "in the perpetration of" a first- or second-degree home invasion in which the homicide occurs several miles away from the dwelling and several minutes after defendant departed from the dwelling.

Following a jury trial, defendant was convicted of two counts of first-degree felony murder, MCL 750.316(1)(b), with home invasion in the first degree, MCL 750.110a, as the predicate felony. Defendant appealed the convictions, asserting that he was no longer "in the perpetration" of home invasion at the time of the automobile collision that killed the victims. The Court of Appeals

concluded that the accident was not "part of the continuous transaction of or immediately connected to the home invasion[,]" and, therefore, vacated the convictions and remanded for a new trial on the charges of second-degree murder. *People v Gillis*, unpublished opinion per curiam of the Court of Appeals, issued August 17, 2004 (Docket No. 245012), slip op at 3. We conclude that "perpetration" encompasses acts by a defendant that occur outside the definitional elements of the predicate felony and includes acts that occur during the unbroken chain of events surrounding that felony. Because defendant at the time of the collision was attempting to escape detection after having been identified during the home invasion, a reasonable juror could conclude that he was still "in the perpetration of" the home invasion. We also conclude that the trial court did not err in failing to instruct on involuntary manslaughter, because no rational view of the evidence could support a finding that defendant acted in a grossly negligent manner or had an intent to injure without malice. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to that Court for consideration of defendant's other issues.

## I. FACTS AND PROCEDURAL HISTORY

Just before 2:00 p.m. on May 24, 2001, Steven Albright observed a vehicle pull into his driveway, and then heard a noise in his garage. Upon investigating, he saw defendant standing in the doorway between the garage and the sunroom. When Albright confronted defendant, defendant closed the door and abruptly left the premises. Albright went back into the house, retrieved a handgun from his

2

bedroom, and sought to confront defendant. As he went out of the front door, he observed defendant driving away in a small white car that he believed to be a Dodge Shadow. Albright then called 911, describing both defendant and the vehicle. After driving his own vehicle around the block for approximately five minutes in an unsuccessful attempt to locate defendant's vehicle, he returned home and called 911 a second time, adding that he had observed a large patch of gray primer on defendant's vehicle.

At 1:51 p.m., Trooper Steven Kramer was driving west on I-94, when he received a "be on the lookout" (BOL) call for a vehicle involved in a home invasion. Trooper Kramer testified that "a couple minutes before 2:00 o'clock" he observed defendant's vehicle, which matched the BOL description, traveling east on I-94. When Kramer first observed the vehicle, it was approximately ten miles from Albright's home. Kramer also testified that it was "a little bit hazy out" when he observed the vehicle. Kramer turned around, pulled up next to defendant's vehicle, and confirmed that both the vehicle and the driver matched the description provided in the BOL.

Kramer activated his vehicle's emergency lights and attempted a traffic stop. Defendant pulled to the shoulder and slowed down to approximately 30 miles per hour, but failed to stop. After driving on the shoulder for about one mile, defendant suddenly accelerated and took an exit off the interstate. After driving on an overpass, defendant quickly reentered I-94, and began driving east in

3

the westbound lanes.[1]  Kramer testified that he gave chase, hoping that his emergency lights would alert oncoming traffic to the presence of defendant's vehicle.  Defendant stayed on the shoulder of what would be the far left lane for the oncoming traffic, traveling at around 60 to 70 miles per hour.[2]  Still driving the wrong way on I-94, he then entered the I-69 eastbound entrance ramp to westbound I-94.  Defendant began driving westward in the eastbound lanes of I-69.  After driving the wrong way on I-69 for approximately one mile, defendant came upon a curve in the road which had guardrails on both sides and no shoulder. At this point, a vehicle occupied by Nicholas and Gayle Ackerman attempted to pass the vehicles slowing down in front of it by pulling into the left lane. Defendant's vehicle and the Ackermans' vehicle collided almost directly head on. Nicholas and Gayle Ackerman were killed instantly.[3]  Trooper Kramer reported the accident at 2:09 p.m., 18 minutes from the time of the BOL call and approximately ten minutes from the time Kramer initially spotted defendant's vehicle.  Defendant was prosecuted for two counts of first-degree felony murder, with the predicate felony of home invasion in the first degree.  Defendant moved

---

[1] Trooper Kramer testified that the exit ramp from westbound I-94 was clearly marked with "Do Not Enter" and "Wrong Way" signs.

[2] Kramer testified that defendant "appeared not [to be] generally interfering with traffic or not trying to interfere with traffic other than the fact that he was going the wrong way on the road."

[3] Defendant suffered a closed-head injury and had amnesia regarding the events of May 21, 2001.

to quash the information on the felony-murder charges, arguing that the crime of home invasion was complete when defendant departed from Albright's home and eluded Albright's pursuit. The trial court denied the motion, holding that the home invasion and the accident were "continuous, uninterrupted by temporary safety action that was taken by this defendant." The trial court also denied defendant's motion for a directed verdict of acquittal, holding that the prosecutor had presented sufficient evidence to allow a reasonable juror to find defendant guilty beyond a reasonable doubt. Following a jury trial, defendant was convicted of two counts of felony murder and sentenced to life in prison without the possibility of parole.

Defendant appealed, contending that the Ackermans' deaths did not occur during the "perpetration or attempt to perpetrate" the home invasion. In a split decision, the Court of Appeals majority applied *People v Thew*, 201 Mich App 78, 85-86; 506 NW2d 547 (1993), which held that, to convict a defendant of felony murder, the murder must be "'committed as a part of a continuous transaction with, or [must be] otherwise "immediately connected" with[] the underlying felony.'" (Citation omitted.) The Court of Appeals majority concluded that "defendant had already escaped from the scene of the home invasion" and, therefore, that the Ackermans' deaths were not "part of the continuous transaction of or immediately connected to the home invasion." *Gillis, supra,* slip op at 3. Judge Meter, who concurred in part and dissented in part, also applied *Thew,* but concluded that because defendant was "engaged in the flight only minutes after

5

committing the home invasion," a rational jury could reasonably conclude that "defendant committed the murders "'while attempting to escape from or prevent detection of the felony . . . [and] as part of a continuous transaction with . . . the . . . felony.""" *Id*., slip op at 2 (Meter, J., concurring in part and dissenting in part), quoting *Thew, supra* at 85-86, quoting *People v Smith,* 55 Mich App 184, 189; 222 NW2d 172 (1974). The majority also concluded that the trial court erred in denying defendant's request for an instruction on involuntary manslaughter, that "[d]efendant should properly have been charged with fleeing and eluding and second-degree murder," and that the matter must be remanded for a new trial on those charges. *Id.*, slip op at 4. This Court granted the prosecutor's application for leave to appeal. 471 Mich 958 (2005).

## II. STANDARD OF REVIEW

The first issue in this case concerns whether the trial court erred in denying defendant's motion to quash under the felony-murder statute, MCL 750.316(1)(b). The proper meaning of a statute constitutes a question of law that this Court reviews de novo. *People v Law*, 459 Mich 419, 423; 591 NW2d 20 (1999). While defendant argues that the trial court committed error by failing to quash the information, where a defendant has received a fair trial, appellate review is limited to the trial court's denial of the defendant's motion for directed verdict. *People v Hall*, 435 Mich 599, 601-603; 460 NW2d 520 (1990). In reviewing the denial of a motion for a directed verdict of acquittal, this Court reviews the evidence in a light most favorable to the prosecution in order to "determine whether a rational trier of

6

fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Riley (After Remand)*, 468 Mich 135, 139-140; 659 NW2d 611 (2003).

The other issue concerns whether the trial court erred in denying defendant's request for an instruction on involuntary manslaughter. "[J]ury instructions that involve questions of law are also reviewed de novo." *People v Schaefer*, 473 Mich 418, 427; 703 NW2d 774 (2005). "But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Hawthorne*, 265 Mich App 47, 50; 692 NW2d 879 (2005).

## III. ANALYSIS

### A. DEFENDANT'S MOTION FOR A DIRECTED VERDICT OF ACQUITTAL

MCL 750.316 states in pertinent part:

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

* * *

(b) Murder committed in the perpetration of, or attempt to perpetrate . . . home invasion in the first or second degree . . . .[4]

---

[4] The use of the term "perpetrate" within the context of the crime of felony murder dates back nearly to statehood. Michigan's original murder statute, 1838 RS, part 4, title 1, ch 3, § 1, defined first-degree murder as follows:

All murder which shall be perpetrated by means of poison or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed *in the perpetration or attempt to perpetrate* any arson, rape, robbery, or

(continued...)

7

"[O]ur primary task in construing a statute, is to discern and give effect to the intent of the Legislature." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). "The words of a statute provide 'the most reliable evidence of its intent . . . .'" *Id*., quoting *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). The Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Sun Valley*, *supra* at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley*, *supra* at 237. "If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id.* at 236.

To describe under what circumstances a second-degree murder can be elevated to first-degree murder, the Legislature used the words "in the perpetration of, or attempt to perpetrate" an enumerated felony. MCL 750.316(1)(b). Home invasion in the first degree is one of these enumerated felonies. *Id.* "Perpetrate" is defined as "to carry out; enact; commit." *Random House Webster's College Dictionary* (1997), p 972. To "carry out" is defined as "to effect or accomplish;

---

(…continued)
  burglary, shall be deemed murder of the first degree, and shall be punished by death . . . . [Emphasis added.]

8

complete." *Id.,* at 201.  Defendant argues that a felony is "complete" when the definitional elements of the crime have been satisfied.  Thus, in the context of a home invasion, defendant argues that he was no longer "in the perpetration of" first-degree home invasion once he left Albright's home.  Indeed, defense counsel admitted under questioning at oral argument that under his interpretation of the statute, if defendant had shot and killed a police officer who was trying to arrest him on the street outside Albright's home, the murder still would not have been "in the perpetration of" the home invasion.[5]  However, defendant's theory fails to account for the fact that commission of the felony itself does not render the defendant's criminal plan complete.  When a defendant plans to commit a felonious act, it is "a legitimate assumption that . . . [the defendant] also planned to escape from the scene of his crime." *Commonwealth v Kelly*, 337 Pa 171, 175; 10 A2d 431 (1940).[6]  The Colorado Supreme Court has understandably opined that

---

[5] Defense counsel was asked, "[I]f there had been a successful home invasion here and Mr. Gillis had left the home and was about to enter his car and the police had arrived upon the scene and he had shot one of the police, your view is that would not be 'in the perpetration of' the home invasion.  Is that correct?"  After clarifying that the hypothetical shooting occurred outside the curtilage of the home, defense counsel responded, "I think it can't take place there."

[6] While not at issue in this case, we also note that a defendant's plan to "carry out" the predicate felony may also include acts leading up to the commission of that felony.  Professor Wayne LaFave notes:

"Where a causal connection between the killing and the underlying felony exists, courts generally have held that a killing may take place *sometime before* or after, as distinguished from during, the felony and yet still qualify as a killing 'in the commission

(continued…)

9

escape is "as important to the execution of the [felony]" as the elements of the crime itself. *Bizup v People,* 150 Colo 214, 218; 371 P2d 786 (1962) (holding that the felony-murder rule applies to a murder committed after the elements of armed robbery were met); see also *People v Boss*, 210 Cal 245, 251; 290 P 881 (1930) (holding that a murder committed during an escape from the scene of an armed robbery is felony murder because "[t]he escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property"). In other words, a felon has not "carried out" or "completed" the felony for felony-murder purposes until the felon has escaped. A murder committed during the attempt to escape is committed "in the perpetration of" that felony, because the felonious transaction has not yet been completed. Accordingly, "perpetration" includes not only the definitional elements of the predicate felony, but also includes those acts that are required to complete the felony-- such as those that occur after the commission of the predicate felony while the felon is attempting to escape. To hold otherwise would make it "'quite

---

(…continued)

> or attempted commission of' the felony." [*Thew, supra* at 86, quoting *People v Goddard,* 135 Mich App 128, 135; 352 NW2d 367 (1984), quoting LaFave & Scott, Criminal Law, § 71, p 555 (emphasis supplied).]

See, e.g., *State v Nelson,* 65 NM 403, 411; 338 P2d 301 (1959) (rejecting the defendant's argument that a murder that precedes the predicate felony cannot be felony murder on the basis that "[i]f a killing is committed within the *res gestae* of the felony charged, whether the homicide occurred before or after the felony, is not determinative").

impracticable to ever convict for a murder committed in the perpetration of any of the [enumerated felonies].'" *Eddy v State,* 496 NE2d 24, 28 (Ind, 1986), quoting *Bissot v State,* 53 Ind 408, 412 (1876).

In addition to its ordinary meaning, the phrase "in the perpetration of" has its roots in the common law. The crime of felony murder is derived from the English common law, which classified "'all killing resulting from the commission of [a felony as] murder.'" *Fisher v State,* 367 Md 218, 248; 786 A2d 706 (1999), quoting Moreland, The Law of Homicide (1952), p 42. The felony-murder rule was adopted by the colonies and, following the American Revolution, "became a part of the common law or statutory provisions of [nearly] every American state." *Rodriguez v State,* 953 SW2d 342, 346 (Tex App, 1997). In most states, including Michigan, felony-murder statutes are premised upon the 1794 felony-murder statute of Pennsylvania.[7] Pennsylvania defined felony murder as

> "[a]ll murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery or burglary . . . ." [*Id.*, citing Keedy, *History of the Pennsylvania statute creating degrees of murder*, 97 U Pa L R 759 (1949).]

Michigan's original first-degree murder statute, enacted in 1838, used the same "in the perpetration of" language to describe a killing committed during the course of an enumerated felony. Our Legislature has continued to use this

---

[7] See, e.g., MCL 750.316(1)(b); Cal Penal Code § 189 (murder "committed in the perpetration of, or attempt to perpetrate" an enumerated felony is first-degree murder); Idaho Code § 18-4003(d) ("Any murder committed in the perpetration of, or attempt to perpetrate" an enumerated felony is first-degree murder.).

language, with few changes, over the past 178 years. However, neither the original statute nor the current murder statute defines this common-law term. "Where a statute employs the general terms of the common law to describe an offense, courts will construe the statutory crime by looking to common-law definitions." *People v Riddle*, 467 Mich 116, 125; 649 NW2d 30 (2002). Thus, in the absence of a clear legislative intent to change the common law, we "apply the common law as it was understood when the crime of murder was codified . . . ." *Id*. at 126.

One of the first states to address the scope of "perpetration" for purposes of a felony-murder statute was Indiana in *Bissot*. In *Bissot,* the defendant shot and killed a town marshal who accosted him in the midst of a burglary. The defendant argued that, because the elements of burglary were complete before the shooting, the killing was not "in the perpetration of" that burglary. The Indiana Supreme Court opined:

> In this case, take away the elements of burglary which surround it, and the prisoner might plausibly contend that he had committed nothing more than excusable homicide; for it appears that the deceased shot at him first, and thus put his life in immediate jeopardy. It could not be higher than manslaughter, at most; and in such cases it might be accidental, and then, if held not to be "in the perpetration" of the burglary, would be excusable. If the charge was murder committed "in the perpetration" of a robbery, as soon as the accused had forcibly and feloniously, or by violence or putting in fear, taken from the person of another any article of value, the robbery would be consummated; yet, if immediately afterwards, in the struggle to release himself and escape, he had killed his victim, the degree of the homicide, unconnected with the robbery, would be no higher than manslaughter. . . .

Although we must construe criminal statutes strictly, adhere closely to the definition of crimes, and interpret technical words according to their fixed meaning, yet we cannot give to the section under consideration the construction contended for by the appellant. In our opinion, where the homicide is committed within the *res gestae* of the felony charged, it is committed in the perpetration of, or attempt to perpetrate, the felony, within the meaning of the statute; and, being convinced in this case that the burglary charged was committed, and that the homicide was committed within the *res gestae* of the burglary, we must hold that it was committed in the perpetration of the burglary, within the true intent and fair meaning of the statute. It seems to us that such a construction is safe to the State and the citizen, and the only one by which the intention of the legislature can be practically carried into effect. And we think, according to this view, that the evidence in this case fairly warrants the conclusion, beyond a reasonable doubt, that the homicide alleged was committed "in the perpetration" of the burglary, as charged in the indictment. [*Bissot, supra* at 412-414.]

See, also, *State v Brown*, 7 Or 186, 208-209 (1879) (noting that in the context of a killing committed during the defendants' escape from the scene of a robbery, "[w]hen a person takes with force or violence the goods of another from his person or presence and against his will, he has committed robbery. . . . [B]ut it does not necessarily complete the crime. It constitutes robbery so far as to render the perpetrator liable to conviction for it; but the act of robbery itself may be prolonged beyond the time when that liability is fixed.").

In commenting on felony-murder statutes, Professor Francis Wharton opined that, in order for a murder to have been committed in the perpetration of a felony,

it must have been done in pursuance of the unlawful act, and not collateral to it. The killing must have had an intimate relation and close connection with the felony, and not be separate, distinct, and independent from it; and when the act constituting the felony is in

13

itself dangerous to life, the killing must be naturally consequent to the felony. . . . It is not enough that it occurred soon or presently after the felony was attempted or committed; there must have been such a legal relationship between the two that it could be said that the killing occurred by reason of, or as a part of, the felony, or that it occurred before the felony was at an end, and was concurrent with it, or at least part of it in an actual and material sense. . . .

Where a homicide is committed within the *res gestae* of a felony, however, it is committed in the perpetration of, or attempt to perpetrate, a felony within the meaning of such statutes. That the attempt to commit the felony was not far advanced does not lessen the offense. And a burglar who breaks into a building, or who shoots a person who discovers him in an effort to escape, cannot avoid punishment for murder in the first degree, upon the theory that the burglary consisted in breaking in, and was consummated before the killing. A burglar may be said to be engaged in the commission of the crime of burglary while making away with the plunder, and while engaged in securing it. So, a robbery within the meaning of a rule that a homicide committed in the perpetration of a robbery is murder in the first degree is not necessarily concluded by the removal of the goods from the presence of the owner; and it is not necessary that the homicide should be committed at the precise time and place of the robbery. As in the case of burglary, the robber may be said to be engaged in the commission of the crime while he is endeavoring to escape and make away with the goods taken. And a homicide committed immediately after a robbery, apparently for the purpose of preventing detection, is within the rule. [Wharton, Law of Homicide (3d ed), § 126, pp 184-186).]

Thus, both the common law, as it was understood when the crime of murder was codified, and the clear language of MCL 750.316(1)(b) lead to the same conclusion-- a murder that occurs during the uninterrupted chain of events surrounding the commission of the predicate felony is committed "in the perpetration of" that felony for felony-murder purposes. Accordingly, we conclude that the term "perpetration" encompasses acts beyond the definitional

elements of the predicate felony, to include those acts committed within the res gestae of that felony. *Bissot, supra*; *Brown, supra*; Wharton, *supra.*

Michigan courts have also routinely held that "perpetration" extends beyond those elements required to prove the predicate felony and includes a murder committed after the predicate felony has been committed or attempted. The res gestae principle, which holds that a murder committed during the unbroken chain of events surrounding the predicate felony is committed "in the perpetration of" that felony, was adopted by this Court in *People v Podolski*, 332 Mich 508; 52 NW2d 201 (1952). In *Podolski*, *supra* at 514, the defendant and two accomplices committed armed robbery at a bank and were attempting to escape, when they were intercepted by the police in the "immediate vicinity of the bank." During the ensuing gun battle, an officer was killed by a bullet from a fellow officer's gun. This Court expressly adopted the reasoning of the Pennsylvania Supreme Court in *Commonwealth v Moyer*, 357 Pa 181, 190-191; 53 A2d 736 (1947), which stated:

> It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. . . . Every robber or burglar knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible.

The Court, quoting Wharton, then concluded that because the homicide[8] occurred during the res gestae of the robbery, i.e., during the defendant's attempt to escape, he was properly convicted of first-degree felony murder. *Podolski, supra* at 517-518.[9]

The Court of Appeals, including both the majority and dissenting opinions in the instant case, has consistently applied the res gestae principle in felony-

---

[8] *Podolski* was decided before *People v Aaron*, 409 Mich 672, 727-728; 299 NW2d 304 (1980). In *Aaron*, we held that a homicide that occurred during the commission of a felony constitutes murder only if the prosecutor specifically proves the existence of malice. Thus, the more precise statement of *Podolski*, in light of *Aaron*, is that a *murder* "committed immediately after a robbery, apparently for the purpose of preventing detection, is [felony murder]." *Podolski, supra* at 518.

[9] Defendant argues that the res gestae principle is no longer applicable in light of this Court's decision in *People v Randolph*, 466 Mich 532; 648 NW2d 164 (2002). In *Randolph*, this Court addressed the issue whether a completed larceny could be "elevated" to unarmed robbery if the defendant uses force before reaching a point of temporary safety. In a divided decision, this Court held that this "transactional approach" was contrary to the language of the statute and that in order for a larceny to be elevated to unarmed robbery, the force and the felonious taking must occur contemporaneously. According to defendant, *Randolph* applies by analogy to this case. The crime of home invasion was complete at the moment defendant entered the building, and the murders took place after defendant left the home and in a place several miles away. The crimes, he argues, were not contemporaneous and, therefore, the felony-murder statute should not apply.

However, we believe that *Randolph* has no applicability in the present context. The murder statute, unlike the unarmed robbery statute in *Randolph*, contains the word "perpetration"-- a word that encompasses a broader range of activities than the core elements of robbery at issue in *Randolph*. We note that the Legislature responded to our decision in *Randolph* by amending the robbery statute, MCL 750.530, to include circumstances where force was used "in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." 2004 PA 128.

16

murder cases for at least four decades. The most common of these cases define "perpetration" in the context of a murder committed during an escape from the scene of an armed robbery. For example, in *People v Oliver*, 63 Mich App 509; 234 NW2d 679 (1975), the defendant's vehicle was stopped by a Michigan State Police trooper half an hour after and "a few miles" away from the scene where the defendant had robbed a bank and kidnapped a teller. During the traffic stop, the defendant shot and killed the trooper. The defendant argued that he was no longer "in the perpetration" of the armed robbery, because he was not being pursued by the police at the time of the traffic stop and because of the time and distance between the robbery and the murder. Thus, according to the defendant, he had reached a place of "temporary safety" before the stop and, therefore, the robbery was completed *before* the murder. The Court of Appeals rejected this argument, holding:

> [The trooper] was shot only a few miles away from the scene of the robbery within a half an hour after its commission. [The trooper] had his gun drawn and was approaching defendant's car when Oliver discharged his revolver and then quickly sped away. It is incredible that the defendant even suggests that he had reached a point of temporary safety at this point. [*Id.* at 523.]

See, also, *People v Bowen*, 12 Mich App 438, 440-441; 162 NW2d 911 (1968) (relying on the dictionary definition of "perpetrate" as "'[t]o carry through'" to conclude that a homicide committed while attempting to leave the bank was felony murder because "it cannot be said that the entire contemplated robbery, which would include escape, was as yet carried through") (citation

17

omitted); *People v Goree*, 30 Mich App 490, 495; 186 NW2d 872 (1971) (holding that a defendant who murdered a police officer who was attempting to arrest him for armed robbery is guilty of felony murder because "escape is part of the original felony [and] getting away with the contraband is as essential to the execution of an armed robbery as the theft itself. The escape ceases to be a continuous part of the original felony when the escaping felon reaches a point of at least temporary safety or [has been successfully taken into police custody].") (citations omitted); *People v Smith,* 55 Mich App 184, 189; 222 NW2d 172 (1974) (stating that "if a murder is committed while attempting to escape from or prevent detection of the felony, it is felony murder, but only if it is committed as a part of a continuous transaction with, or is otherwise 'immediately connected' with, the underlying felony"); *People v Goddard*, 135 Mich App 128, 135; 352 NW2d 367 (1984), rev'd on other grounds 429 Mich 505 (1988) (noting that Michigan's inclusion of murders committed while attempting to escape within the felony-murder rule "has been adopted in other jurisdictions").

The Court of Appeals has also applied the res gestae principle to murders committed "in the perpetration" of felonies other than armed robbery. In *People v Gimotty*, 216 Mich App 254; 549 NW2d 39 (1996), the codefendant stole six dresses from a clothing store and he and the defendant sped away in the defendant's vehicle. The vehicle was identified by another driver, who called the police and then followed the vehicle until the police arrived. Once the police joined the pursuit, they identified the defendant's vehicle and gave chase. During

18

the pursuit, the defendant failed to stop at a red light and struck another vehicle. A three-year-old passenger in the other vehicle died as a result of the collision. The defendant argued that the codefendant's commission of retail fraud was complete when he left the store and, therefore, that he had reached a point of temporary safety when he got into the car. The Court of Appeals disagreed, concluding that

> defendant sped out of the store's parking area and onto Coolidge Road, where he was observed by another driver, who called the police on his car phone and then followed defendant until the police began their pursuit. Defendant was in the midst of a high-speed police chase when the victim was killed; he had not reached a place of temporary safety. [*Id.* at 258-259.]

See, also, *Thew*, *supra* at 88 (holding that a murder committed 20 minutes after the commission of first-degree criminal sexual conduct was part of a continuous transaction and that "inculpatory inferences can be drawn that he killed the victim to prevent detection of the act of sexual intercourse with [the victim], and that the killing was 'immediately connected' with the act of sexual intercourse").

To summarize, "perpetration" as used in the felony-murder statute contemplates something beyond the definitional elements of the predicate felony. Michigan courts have recognized this broader common-law meaning through the adoption of the "res gestae" principle, which holds that a murder committed

during the unbroken chain of events surrounding the predicate felony is committed "in the perpetration of" that felony.[10]

Having concluded that "perpetration" encompasses acts beyond the definitional elements of the predicate felony, we must next assess what factors a jury should consider to determine whether a murder has, in fact, taken place during the unbroken chain of events arising out of the predicate felony.[11] As

---

[10] The concurrence/dissent would define "perpetration" to require that the police either be in hot pursuit following commission of the underlying felony or that they take up a chase initiated by a civilian. *Post* at 4-5. However, it fails to cite any authority for its definition, and, in fact, its definition has been rejected by a number of courts. See, e.g., *Oliver*, *supra* at 523 (rejecting as "incredible" the defendant's assertion that he had reached a point of temporary safety by driving unpursued for half an hour after committing a bank robbery and holding that his subsequent murder of a State Police trooper was committed "in the perpetration of" the bank robbery); *State v Squire*, 292 NC 494, 512; 234 SE2d 563 (1977) (holding that the defendants who had left the scene of an armed robbery without pursuit had "[o]bviously . . . not reached what they regarded as a place of temporary safety" when their vehicle was pulled over by a police officer 13 minutes after the robbery); *Lampkin v State,* 808 P2d 694 (Okla Crim App, 1991) (holding that a defendant who was observed disobeying a stop sign in the vicinity of a robbery, but who was not being pursued for the robbery, was still "in the perpetration of" that robbery when he led police on a high-speed chase that ended in a fatal collision); *People v Salas*, 7 Cal 3d 812; 103 Cal Rptr 431; 500 P2d 7 (1972) (holding that the defendants, who had left the scene of an armed robbery unpursued but were stopped by police just three minutes after leaving the scene, had not reached a place of temporary safety when one of the defendants shot and killed the officer).

[11] The concurrence/dissent attempts to explain the nearly universal rejection of its novel definition of "perpetration" by theorizing that the term has a different meaning in the context of felonies involving the asportation of stolen property. *Post* at 6 n 4. Specifically, it suggests that a defendant "must be engaged in some act that is required for the full execution of the underlying crime for the defendant to be considered still in perpetration of that felony." *Id.* (emphasis deleted), citing *Franks v State,* 636 P2d 361, 365 (Okla Crim App, 1981). Because defendant here

(continued...)

20

observed by the Ohio Supreme Court, those acts committed in the perpetration of the predicate felony "change with every case, and may be numerous." *Conrad v State,* 75 Ohio St 52, 70; 78 NE 957 (1906). In *Goddard, supra* at 135-136, the Court of Appeals explained that, in order to determine whether a particular murder occurred within the res gestae of the predicate felony,

> [c]ourts have usually required that the killing and the underlying felony be "closely connected in point of time, place and causal relation." *State v Adams*, 399 Mo 926; 98 SW2d 632 (1936). The required relationship between the homicide and the underlying felony has been summarized as being "whether there is a sufficient causal connection between the felony and the homicide depends on whether the defendant's felony dictated his conduct which led to the homicide." LaFave & Scott, [Criminal Law, § 71, p 557.]
>
> We hold that, to qualify as felony murder, the homicide must be incident to the felony and associated with it as one of its hazards. It is not necessary that the murder be contemporaneous with the felony. A lapse of time and distance are factors to be considered, but are not determinative.

Professor Wayne LaFave has also observed that a jury should look at four factors "in construing the scope of the expression 'in the perpetration of'": (1) time; (2) place; (3) causation; and (4) continuity of action. 2 LaFave, Substantive

---

(…continued)

was not transporting stolen property, he "was not engaged in some act required for the full execution of a home invasion when the trooper attempted to stop him." *Id.* However, in almost every circumstance escape is part of a defendant's plan to commit a felony. *Kelly*, *supra* at 175. Thus, the instant home invasion, as with any other felony, was not "fully executed" until defendant effected his escape.

Criminal Law (2d ed), § 14.5(f), p 463.[12]  While not exclusive, we agree that these factors should be considered in determining whether there exists sufficient evidence to support a felony-murder conviction.[13]

The first factor to be considered by the jury pertains to the time between the commission of the predicate felony and the murder.  In discussing the "time" factor, Professor LaFave states that,

> even if it is clear beyond question that the crime was completed before the killing, the felony-murder rule might still apply.  The most common case is that in which the killing occurs during the defendant's flight.  A great many of the modern statutes contain language—typically the phrase "or in immediate flight therefrom"—making this absolutely clear.  But even statutes without such language have rather consistently been construed to extend to immediate flight situations.  [*Id.* at 464.]

---

[12] While Professor LaFave only lists the first three factors, he makes clear that a jury must also consider whether the murder was committed within the same "'chain of events'" as the predicate felony.  *Id.* at 464-465.  Thus, "continuity of action" is distinct factor that should be considered by a jury.  See, e.g., *State v Pierce,* 23 SW3d 289, 295 (Tenn, 2000) (citing LaFave and stating that "we must evaluate the sufficiency of the evidence to determine if the [killing] and the felony . . . are closely connected in time, place, and causation, and continuity of action").

[13] While the LaFave factors have not been considered as a whole by Michigan courts, we note that the individual factors have been separately addressed in a number of cases.  See, e.g., *Thew, supra* (discussing the time between the defendant's commission of criminal sexual conduct and the murder of the victim); *Gimotty, supra* (noting the causal connection between the commission of retail fraud and a murder committed while the defendant was attempting to flee from the scene); *Oliver, supra* (holding that a defendant who was driving unpursued at normal highway speeds had not broken the chain of events linking the commission of a robbery and the murder of a State Police trooper).

22

For example, in *Oliver,* the Court of Appeals concluded that the defendant was still in immediate flight from an armed robbery when he murdered a State Police trooper 30 minutes after the commission of an armed robbery. See, also, *Thew* (affirming a felony-murder conviction for a murder committed 20 minutes after the predicate felony). At the same time, the Tennessee Supreme Court held that a killing that took place almost a month after the commission of the predicate felony was too remote in time to support a conviction of felony murder. *State v Pierce*, 23 SW3d 289, 297 (Tenn, 2000). In *Pierce*, the defendant's girlfriend stole her parents' vehicle in Florida. The vehicle was reported stolen and a nationwide bulletin was issued for the vehicle. Twenty days later, while driving the vehicle, the defendant was identified by a Virginia police officer, who gave chase. When the defendant crossed into Tennessee, the Virginia police officer notified Tennessee law enforcement officers, who took over the pursuit. During the pursuit, the defendant struck a police car, killing a deputy sheriff. The Tennessee court rejected the prosecutor's argument that the killing occurred within the res gestae of the automobile theft, concluding that "the killing in this case was not closely connected in time or place to the taking of the vehicle." *Id.*

The second factor to be considered by a jury pertains to the physical distance between the scene of the predicate felony and the scene of the murder. For example, in *State v Squire*, 292 NC 494, 512; 234 SE2d 563 (1977), the defendants' vehicle was stopped for a traffic violation by a North Carolina State Police trooper 13 minutes after and ten miles away from the scene where the

defendants had robbed a bank. A codefendant, under the apparent mistaken belief that the trooper was investigating the robbery, shot and killed the trooper. The North Carolina Supreme Court upheld the defendant's felony-murder conviction, holding that,

> [o]bviously, the defendants had not reached what they regarded as a place of temporary safety from pursuing officers when the shooting of [the trooper] occurred. Thus, the robbery was still in progress and the shooting occurred in the perpetration of it and was first degree murder. [*Id.* at 512-513.]

At the same time, the Virginia Supreme Court held that a killing that took place 280 miles from the scene of the predicate felony was too remote to support a conviction of felony murder. *Doane v Commonwealth,* 218 Va 500, 502-503; 237 SE2d 797 (1977). In *Doane*, the defendant stole a vehicle from a car dealership. The next day, the defendant disobeyed a stop sign, striking another vehicle and killing the driver. The accident occurred 280 miles away from the scene of the predicate felony. The prosecutor argued that, because the defendant was still in possession of the stolen vehicle at the time of the killing, there was a sufficient nexus between the killing and the predicate felony to support a felony-murder conviction. The Virginia court rejected this argument, holding that "there is neither a showing of causal relationship nor a showing of nexus between the larceny . . . and the accidental killing of [the victim 280 miles from the scene of the larceny.]" *Id.* at 502.

However, "more than a mere coincidence of time and place is necessary" for a murder to qualify as a felony murder. LaFave, *supra* at 465. The third

24

factor to be considered by the jury pertains to whether there is "some causal connection" between the murder and the predicate felony. *Id.* For example, in *Gimotty,* the defendant collided with the victim's vehicle while attempting to avoid capture by the police after fleeing from the scene of a larceny. Likewise, in *Podolski,* the defendant engaged in a gun battle with the police in order to avoid capture after robbing a bank. However, in *Allen v State,* 690 So 2d 1332, 1334 (Fla Dist Ct App, 1997), the Florida District Court of Appeals held that a vehicle accident that occurred outside the context of a pursuit was not causally connected to the predicate felony. In *Allen*, the defendant stole a vehicle and, while driving the vehicle that evening, struck another car, killing the driver. At the time of the accident, the defendant was not being pursued by the police. The Florida court noted that, while the killing was close in time and place to the commission of the predicate felony, the prosecutor failed to show "that the death was causally related to the grand theft." *Id.* Thus, the Florida court held that because the killing did not occur while the defendant was trying to escape, "the death did not occur as a result of the perpetration of the grand theft." *Id.* at 1335.

The fourth factor that the jury should consider pertains to whether there was continuity of action between the predicate felony and the murder. Professor LaFave notes that "perpetration"

> [has] consistently been construed to extend to immediate flight situations. In assessing what flight is sufficiently immediate, courts require that there have been "no break in the chain of events," as to which a most important consideration is whether the fleeing felon

has reached a "place of temporary safety." [LaFave, *supra* at 464-465.]

In *Oliver, supra* at 523, the Court of Appeals rejected the defendant's claim that he had reached a point of "temporary safety" by driving unpursued at normal highway speeds, holding that there was no interruption in the chain of events between the robbery and the murder of a State Police trooper who had stopped the defendant's vehicle for a traffic infraction. The Oklahoma Court of Criminal Appeals reached a similar conclusion in addressing a situation bearing a strong resemblance to the instant case in *Lampkin v State,* 808 P2d 694 (Okla Crim App, 1991). In *Lampkin*, the defendant had left the scene of an armed robbery when a police officer observed him disobey a stop sign. The defendant was spotted in the vicinity of the scene of the robbery, just minutes after he had committed the crime. When the officer attempted a traffic stop, the defendant accelerated and a high-speed chase ensued. It was only after the chase began that the officer learned that the defendant was a suspect in a robbery. The chase ended when the defendant struck another vehicle, killing the passengers. The Oklahoma court rejected the defendant's assertion that the robbery was "complete" at the time of the accident, noting that he "had not yet completed the robbery when the chase started; he was not yet in a safe haven, but rather was still in the process of leaving with the stolen money." *Id.* at 696. Therefore, because the accident was part of one continuing

transaction stemming from the robbery, the defendant was properly convicted of felony murder. *Id.*[14]

In contrast, there can be no conviction for felony murder where an intervening act has broken the chain of events "between the killing and the crime committed or attempted . . . ." *State v Diebold*, 152 Wash 68, 72; 277 P 394 (1929). In *Diebold*, the defendant and his friend stole a vehicle and drove it to a café five miles away. The defendant testified that, during the meal, he decided to return the vehicle. On the way back to the scene of the larceny, the defendant lost control of the vehicle, striking and killing a pedestrian. The Washington Supreme Court determined that, because the killing took place after the defendant had stopped at the café, "[i]t cannot be held that, at the time appellant drove his car against the unfortunate victims of his carelessness, he was committing, or attempting to commit, or withdrawing from the scene of, a felony." *Id.* at 73-74. See, also, *Lester v State,* 737 So 2d 1149, 1151-1152 (Fla Dist Ct App, 1999) (The defendant, driving in a vehicle he had stolen the night before, saw a police car and drove away unpursued, eventually disobeying three stop signs before hitting

---

[14] But see *Franks v State,* 636 P2d 361 (Okla Crim App, 1981). In *Franks*, the defendant was stopped by a police officer for a traffic violation ten blocks away from the scene of an armed robbery. The officer was unaware of the robbery at the time of the stop. The defendant managed to disarm the officer and leave without being arrested. While the defendant was driving unpursued, he disobeyed a stop sign, striking another vehicle and killing the driver. The Oklahoma Court of Criminal Appeals held that the accident was unrelated to the robbery, primarily because the defendant "was not pursued as he left the grocery store robbery nor was he being chased by a police car at the time of the accident." *Id.* at 365.

another vehicle and killing the passengers. The Florida District Court of Appeals held that the theft of the vehicle had been "completed" the night before the accident and, therefore, that defendant's "reckless driving was too attenuated from the grand theft of the car the previous evening to support a felony murder conviction."); *People v Ford*, 65 Cal 2d 41; 416 P2d 132 (1966) (The defendant kidnapped his estranged wife and burglarized the home she was living in. After "[driving] about the countryside without aim or purpose," *id.* at 48, for approximately four hours, he shot and killed a police officer who attempted to disarm him. The California Supreme Court held that the defendant had "won his way to places of temporary safety" during the four-hour drive, because "there was here no direct evidence that defendant was endeavoring to escape the robbery when he shot the [officer] . . . ." *Id.* at 56-57.).

In light of this analysis, we conclude that the trial court here did not err in denying defendant's motion for a directed verdict of acquittal. The relevant question in the instant case is whether, viewing the evidence in a light most favorable to the prosecutor, a reasonable juror could conclude beyond a reasonable doubt that defendant was still in the midst of his escape from the home invasion when he struck and killed the Ackermans. After its review of the case law, and in particular *Gimotty,* the trial court correctly instructed the jury as follows:

> Actions immediately connected with the felony of home invasion in the first degree, including attempts to escape or prevent detection[,] are a continuous part of the commission or perpetration of the felony of home invasion in the first degree. . . . [E]scape ceases to be a continuous part of the felony of home invasion in the

first degree if and when the Defendant reaches a point of at least temporary safety.

The facts elicited at trial support the jury's determination that the murder of the Ackermans was "a continuous part of the commission or perpetration of the felony of home invasion in the first degree." Here, the homeowner, Albright, confronted defendant in the doorway between the garage and the sunroom. Defendant closed the door and abruptly fled. Albright observed both defendant and his vehicle flee from the scene of the home invasion. A reasonable juror could infer from defendant's flight his intent to avoid apprehension by the police. Additionally, he was still in flight from the Albright home when Trooper Kramer spotted him approximately ten minutes after his abrupt flight. Under these facts, a reasonable juror could conclude that defendant had neither escaped nor reached a point of temporary safety when Trooper Kramer attempted the traffic stop.[15] Further, a reasonable juror could conclude that defendant had sped away from Trooper Kramer specifically in order to prevent detection of the home invasion. Therefore, such a juror could also conclude that when defendant collided with the Ackermans' vehicle during his flight from the police, that act was part of the res

_____

[15] We are not holding that the jury may consider defendant's subjective understanding of whether he had reached a point of temporary safety. Instead, we are merely holding that the jury may consider all the objective facts surrounding defendant's flight, including reasonable inferences that may be drawn from this evidence. The question whether defendant has reached a point of temporary safety is a question of fact for the jury. Here, a juror could reasonably infer from defendant's actions that he was aware that Albright had spotted him at the scene of the home invasion. The jury properly considered this inference as evidence that defendant had not truly reached a point of temporary safety.

gestae of the home invasion. Accordingly, the trial court did not err in denying defendant's motion for a directed verdict of acquittal.

Application of the LaFave factors lends further support to the jury's verdict. First, addressing the time and place factors, a reasonable juror could conclude that the murders and the predicate felony in the instant case were sufficiently connected in time and place to support the convictions of felony murder. Approximately ten minutes after the home invasion, defendant's vehicle was spotted by Trooper Kramer. Defendant struck and killed the Ackermans approximately 18 minutes after leaving the scene of the home invasion. The time frame in this case is completely unlike that in *Pierce,* in which there was a 20-day gap between the predicate felony and the killing. Indeed, the 18-minute gap in the instant case is significantly less time than the 30-minute interval between the bank robbery and the traffic stop in *Oliver*. Likewise, the distance between the home invasion and the murder of the Ackermans does not resemble the 280-mile gap between the theft of a vehicle and the killing in *Doane*. Rather, in the instant case, defendant was spotted by Trooper Kramer just over ten miles from Albright's home. The Ackermans were killed within a few miles of the place were defendant was first observed by Albright. Accordingly, we conclude that the scene of the murders was sufficiently close in both time and distance from the scene of the home invasion to support convictions of felony murder.

Likewise, the "causal connection" and "continuity of action" factors also support the jury's conclusion that defendant was "in the perpetration of" the home

invasion when he murdered the Ackermans. The common thread running through the cases finding a lack of causal connection is that the defendant was *not* being pursued by the police when the defendant committed the murder. *Doane, supra; Allen, supra; Franks v State,* 636 P2d 361, 365 (Okla Crim App, 1981); *Diebold, supra*; *Lester, supra*. However, in the instant case, the record establishes that defendant was interrupted by Albright in the midst of the home invasion. Defendant's reaction was to abruptly flee. Albright testified that he relayed both a description of defendant and a description of the unique characteristics of defendant's vehicle to the police immediately after defendant fled the scene. Approximately ten minutes after the home invasion, defendant's vehicle was spotted by Trooper Kramer. The Court of Appeals concluded that because defendant was driving "in a normal manner" at the time he was spotted by Trooper Kramer, he had reached a point of "temporary safety." However, defendant had not stopped at any point between Albright's home and the point where he was observed by Trooper Kramer. Cf. *Diebold* (the defendant had stopped at a café between the theft and the killing of a pedestrian). Further, defendant's actions were not inconsistent with those of a person attempting to escape detection by the police, cf. *Ford* (the defendant's aimless driving for four hours after commission of the predicate felony demonstrated that he was not attempting to escape at the time he shot a police officer), and, in fact, defendant's act of speeding away from Trooper Kramer during the attempted traffic stop suggests both a causal connection and a continuity of action between the home invasion and the murders.

31

The Court of Appeals failed to consider that defendant recognized that he had been identified as the perpetrator of a home invasion just minutes before. It is reasonable to infer from the testimony at trial that defendant failed to comply with Kramer's direction to stop and instead sped away precisely *because* of this knowledge. Had defendant assumed, for example, that he was being stopped for a broken headlight or for an improper left turn, it seems highly unlikely that he would have failed to stop and instead engage in the extremely reckless driving that followed. The evidence is consistent with the prosecutor's theory that when defendant led Kramer on a chase while driving the wrong way on I-94 and I-69, he did so in order to escape apprehension for the home invasion. As in *Gimotty,* defendant's act of colliding with the Ackermans' vehicle and killing the couple was part of an unbroken chain of events surrounding the home invasion. Because a reasonable juror could conclude beyond a reasonable doubt that the Ackermans' murders occurred as part of the res gestae of the home invasion, the trial court properly denied defendant's motion to direct a verdict of acquittal.[16]

_____

[16] The concurrence/dissent asserts that we have created "a rule that there is no rule and the question whether defendant has reached a place of temporary safety always goes to the jury." *Post* at 5. However, we simply hold that "perpetration" constitutes an element of first-degree murder. As with any other element of any other crime, the trial court may direct a verdict in favor of the defendant when the prosecutor fails to "introduce sufficient evidence which could justify a trier of fact in reasonably concluding that defendant is guilty beyond a reasonable doubt . . . ." *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). But, where a reasonable juror could find that a defendant was "in the perpetration of" the underlying felony when the defendant committed the murder, as is the case here, the question whether the defendant has reached a place of

(continued…)

## B. FAILURE TO INSTRUCT

Manslaughter is a necessarily included lesser offense of murder. *People v Mendoza*, 468 Mich 527, 544; 664 NW2d 685 (2003). "[W]hen a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Id.* at 541. In the instant case, defendant requested an instruction on involuntary manslaughter.[17] In *People v Holtschlag*, 471 Mich 1, 21-22; 684 NW2d 730 (2004), we noted that

> "the sole element distinguishing manslaughter and murder is malice," *Mendoza* at 536, and that "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary: 'Every unintentional killing of a human being is involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse.'" [*People v Datema*, 448 Mich 585, 594-595; 533 NW2d 272 (1995).] (Citation omitted.) If a homicide is not voluntary manslaughter or excused or justified, it is, generally, either murder or involuntary manslaughter. If the homicide was committed with malice, it is murder. If it was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter.

"Malice" is defined as an act done "with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable

---

(…continued)
temporary safety does constitute a question for the finder of fact. *Smith, supra* at 190.

[17] The Court of Appeals did not reach defendant's other claims of instructional error-- that the trial court denied defendant's request for instructions on first-degree fleeing and eluding (causing death) and voluntary manslaughter.

result." *Mendoza, supra* at 540. Thus, defendant was entitled to an involuntary manslaughter instruction *only* if a rational view of the evidence would have supported a finding that the Ackermans' deaths were caused by an act of "gross negligence or an intent to injure, and not malice . . . ." *Holtschlag, supra* at 21-22.

The Court of Appeals majority concluded that it was "possible for a rational trier of fact to determine from the evidence that defendant only possessed the mindset of gross negligence." *Gillis, supra,* slip op at 5. We disagree and hold that no rational juror, under these facts, could conclude that defendant's actions were anything other than acts that "create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Mendoza, supra* at 540. Defendant, in his attempt to get away from Trooper Kramer, knowingly entered I-94 going the wrong way. The ramp used by defendant was clearly marked with "Do Not Enter" and "Wrong Way" signs. Further, another officer assisting in the chase crossed over the median and began driving the proper way on I-94 in order to get in front of defendant. Finally, Trooper Kramer testified that he and defendant went past several vehicles on both I-94 and I-69, all of which were being driven the correct way. This was not a circumstance where a driver, through an act of gross negligence, accidentally drove the wrong direction on the highway. Rather, this defendant intentionally drove the wrong way on the freeway and continued to do so for approximately ten minutes before colliding with the Ackermans' vehicle. Trooper Kramer also testified that he was "quite certain [that oncoming traffic] would not have seen

34

[defendant's] small white car . . . ." In fact, this fear of a potential head-on collision was Kramer's primary reason for continuing his pursuit. In other words, by driving the wrong way on the interstate on a hazy day, defendant created a "very high risk" of a head-on collision-- a collision that would certainly cause "death or great bodily harm." Further, it would be unreasonable to conclude that defendant did not know that a serious or fatal accident was the probable result of driving the wrong way on the interstate. No rational view of the evidence could support a finding of gross negligence or an intent to injure without malice.

Because the evidence does not support the conclusion that defendant drove the wrong way by accident or otherwise acted in a merely grossly negligent manner, we conclude that a rational view of the evidence does not support an involuntary manslaughter instruction. Therefore, the trial court did not err by failing to give an involuntary manslaughter instruction.[18]

---

[18] Even if defendant was entitled to an involuntary manslaughter instruction, the trial court's failure to so instruct constituted harmless error. Harmless error analysis is applicable to instructional errors involving necessarily included lesser offenses. *People v Cornell*, 466 Mich 335, 361; 646 NW2d 127 (2002). Such errors are deemed non-constitutional errors. *Id.* at 363. "[A] preserved, non-constitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Here, defendant was charged with both first- and second-degree murder. The jury convicted of first-degree murder, the greater offense. Given the jury's refusal to either acquit or convict of the lesser offense, defendant has failed to demonstrate that a "miscarriage of justice" occurred when the trial court failed to instruct on involuntary manslaughter.

## IV. CONCLUSION

We conclude that "perpetration" encompasses acts by a defendant that occur outside the definitional elements of the predicate felony and includes acts that occur during the unbroken chain of events surrounding that felony. Thus, a felon "is engaged in the perpetration of the crime 'while he is endeavoring to escape . . . [a]nd a [murder] committed immediately after a [felony], apparently for the purpose of preventing detection,' is felony murder." *Smith, supra* at 189, quoting *Podolski, supra* at 518 (emphasis omitted). In determining whether the defendant is still "in the perpetration of" the predicate felony when the defendant commits a murder, factors to be evaluated by the jury include: (1) the length of time between commission of the predicate felony and the murder; (2) the distance between the scene of the predicate felony and the scene of the murder; (3) whether there is a causal connection between the murder and the predicate felony; and (4) whether there is continuity of action between the predicate felony and the murder. LaFave, *supra* at 463, 464-465. Applying these factors to the instant case, we conclude that the trial court did not err in denying defendant's motion to direct a verdict of acquittal because, viewing the evidence in a light most favorable to the prosecutor, a reasonable juror could conclude beyond a reasonable doubt that the murders were within the res gestae of the predicate home invasion. We further conclude that the trial court did not err in refusing defendant's request for an involuntary manslaughter instruction. Accordingly, we reverse the judgment of

36

the Court of Appeals and remand this case to the Court of Appeals for consideration of defendant's other issues.[19]

Stephen J. Markman
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.

---

[19] We also directed the parties to address the issue whether the Court of Appeals order of remand for a new trial violated the separation of powers doctrine. Const 1963, art 3, § 2. The power to determine whether to charge a defendant and what charge should be brought is an executive power, which vests exclusively in the prosecutor. *People v Williams,* 244 Mich App 249, 252-253; 625 NW2d 132 (2001), citing *Genesee Prosecutor v Genesee Circuit Judge*, 386 Mich 672, 683; 194 NW2d 693 (1972). The exercise of judicial power over the discharge of the prosecutor's duties "is limited to those activities or decisions by the prosecutor that are unconstitutional, illegal, or ultra vires." *People v Morrow*, 214 Mich App 158, 161; 542 NW2d 324 (1995).

When the Court of Appeals remanded this case to the trial court, it noted that "[d]efendant should properly have been charged with fleeing and eluding and second-degree murder." *Gillis, supra,* slip op at 4. We do not believe that this statement constitutes a usurpation of the prosecutor's powers. Rather, the Court of Appeals was simply advising the trial court as to the new trial in accordance with its holding that defendant could not be charged with first-degree felony murder. Had the Court of Appeals purported to substitute its judgment for that of the prosecutor by determining what criminal charges should be brought against defendant, we agree with the prosecutor that there would have been separation of powers implications.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

V                                  No. 127194

JOHN ALBERT GILLIS,

      Defendant-Appellee.

_____

TAYLOR, C. J. (*concurring in part and dissenting in part*).

I concur with the majority opinion that a defendant is no longer "in the perpetration of" an enumerated felony when he or she has reached a place of temporary safety. I also agree with the majority that "perpetration" may encompass acts beyond the definitional elements of the predicate felony to include acts committed within the res gestae of that felony. I dissent, however, from the majority's application of this test to the facts of this case.

I

The facts are straightforward. Defendant was discovered by the homeowner right after he broke into the garage. Defendant fled the scene. The homeowner called 911 and was unsuccessful in an attempt to follow defendant, who got away in his car. Ten to fifteen minutes later, at a distance of at least ten miles from the scene of the home invasion, the police spotted a car matching the

one the homeowner described and attempted to stop defendant. He did not stop, but fled and soon thereafter crashed into the Ackermans' car, resulting in their deaths.

Defendant was charged with two counts of felony murder, with first-degree home invasion as the enumerated felony. Defendant waived his right to a preliminary examination. Before trial defendant moved to quash the felony-murder charges, arguing that he was no longer "in the perpetration of" the home invasion when the Ackermans were killed. An evidentiary hearing was held in which the homeowner and the state trooper who attempted to stop defendant testified. The trial court denied the motion to quash, finding that "this was a continuous uninterrupted by temporary safety action that was taken by this Defendant."[1]

At trial, after the prosecutor rested his case, defense counsel moved for a directed verdict on the felony-murder charges, asserting that there was no nexus between the home invasion and the Ackermans' deaths. The trial court denied the

---

[1] The trial court's decision after the evidentiary hearing was akin to a decision whether there was sufficient evidence to bind a defendant over for trial after a preliminary examination. The Court of Appeals concluded that the motion to quash should have been granted. I agree, but, given that defendant went to trial, appellate review is properly limited to the trial court's denial of his motion for directed verdict. *People v Yost,* 468 Mich 122, 124 n 2; 659 NW2d 604 (2003), citing *People v Hall*, 435 Mich 599, 601-603; 460 NW2d 520 (1990) (an evidentiary deficiency at the preliminary examination is not a ground for vacating or reversing a subsequent conviction where the defendant received a fair trial and was not otherwise prejudiced by the error). See also *People v Wilson*, 469 Mich 1018 (2004). In light of this principle, the Court of Appeals erred in analyzing whether the motion to quash should have been granted.

motion, stating that one could determine beyond a reasonable doubt that defendant, while in the perpetration of or attempt to perpetrate the home invasion, murdered the Ackermans.

As previously noted, the jury subsequently convicted defendant of two counts of felony murder. On appeal, the Court of Appeals reversed the felony-murder convictions in a split decision because defendant had already escaped from the scene of the home invasion and the Ackermans' deaths were not a part of the continuous transaction of or immediately connected to the home invasion.

II

At the time of defendant's trial, MCR 6.419(A) provided:

> After the prosecutor has rested the prosecution's case in chief and before the defendant presents proofs, the court on its own initiative may, or on the defendant's motion must, direct a verdict of acquittal on any charged offense as to which the evidence is insufficient to support conviction.

When ruling on a motion for a directed verdict of acquittal, the trial court must determine whether, considering the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979) (opinion by Coleman, C.J.). The test is not whether there was any evidence to support the conviction, but whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt. *Id.*

MCL 750.316 states in pertinent part:

3

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

* * *

(b) Murder committed in the perpetration of, or attempt to perpetrate, . . . home invasion in the first or second degree . . . .

Whether a defendant is still "in the perpetration of" an enumerated felony when a homicide occurs is either a question of law or a question of fact depending on the strength of the evidence presented to the jury.[2] Thus, if the evidence is such that a rational fact-finder could not conclude the defendant was still "in the perpetration of" an enumerated felony, the court should not submit the issue to the jury. The court is to decide the issue as a matter of law. I believe we deal with such a situation here.

This case implicates what it means to be in a place of temporary safety and should be a vehicle for establishing usable rules for cases in which a defendant

---

[2] As stated in Anno: *What constitutes termination of felony for purpose of felony-murder rule*, 58 ALR3d 851, 857:

[T]he facts of a particular case may be such that there can be no doubt whether the felony and killing are part of one transaction, so that the question should not be submitted to the jury but should be decided by the court as a matter of law.

See, e.g., *Allen v State,* 690 So 2d 1332 (Fla App, 1997), *Doane v Commonwealth,* 218 Va 500; 237 SE2d 797 (1977), and *Franks v State,* 636 P2d 361 (Okla Crim App, 1981), all cases that determined as a matter of law that a defendant was no longer "in the perpetration of" a felony when a homicide occurred.

takes flight in a car. I believe the majority in its opinion has really established no rule, or perhaps has created a rule that there is no rule and the question whether defendant has reached a place of temporary safety always goes to the jury. This uncabined rule is unwise because it obliterates any meaning that the point of temporary safety jurisprudence may have had. At least in situations in which the underlying enumerated felony does not involve the asportation of stolen property, I believe the rule should be as follows. Whether a defendant who is being chased has reached a point of temporary safety and, thus, is no longer engaged "in the perpetration of an enumerated felony" should be gauged by objectively assessing the state of the investigation at the time the arrest is attempted. If the investigation at that point was not the result of apprehenders hotly pursuing the defendant from the scene of the crime, but rather was the result of a fresh pursuit begun after having gathered information about the underlying crime, then the defendant can be said to have reached a point of temporary safety. Having reached a point of temporary safety, the defendant is no longer in the perpetration of the underlying crime. [3]

---

[3] I have no objection to the four factors the majority cites from Professor LaFave for determining whether a defendant is still "in the perpetration of" a felony, i.e., time, place, causation, and continuity of action, but simply contend that their application shows, as a matter of law, that defendant was no longer "in the perpetration of" the home invasion when defendant decided to flee rather than stop for the trooper.

Here, there is no question that defendant was spotted by the trooper after the victim's attempt to follow defendant had ended. The trooper, unlike the officers in many of the cases cited by the majority,[4] had not taken up the chase the

---

[4] I note that many of the cases cited by the majority in which a defendant was determined to still have been "in the perpetration of" a felony involved situations in which the homicide occurred at, or immediately near, the scene of the crime or as a result of a hot pursuit. See, e.g., *People v Podolski*, 332 Mich 508, 514; 52 NW2d 201 (1952), which indicates that the bank robbers were about to escape when the police arrived. See, also, *People v Gimotty,* 216 Mich App 254, 258-259; 549 NW2d 39 (1996), in which the defendant sped from the store's parking lot onto a road where he was observed by another driver who called the police on his car phone and followed the defendant until the police took over the pursuit. To the extent that *People v Oliver*, 63 Mich App 509; 234 NW2d 679 (1975), is to the contrary, I would not follow it. But, I note that in *Oliver,* as in most of the cases cited by the majority, the underlying felony was a robbery where the defendant was making away with stolen goods. Under such circumstances, i.e., one of the elements of the underlying crime involves asportation of stolen property, a defendant may be considered to still be "in perpetration of" the underlying crime for a longer period than when a defendant, as here, commits a crime that is over no later than when the defendant leaves the scene. But, we are not required to decide that question here.

The majority cites *State v Squire*, 292 NC 494; 234 SE2d 563 (1977), *Lampkin v State,* 808 P2d 694, 696 (Okla Crim App, 1991), and *People v Salas*, 7 Cal 3d 812; 103 Cal Rptr 431; 500 P 2d 7 (1972), in support of the proposition that one may still be in the perpetration of a felony when there is no hot pursuit. But in each of these cases, the underlying crime was robbery where money was being asported away. In *Lampkin*, the court stated that the defendant was still in the process of leaving with the stolen money when he was observed by the police driving at a fast speed and disobeying a stop sign. In contrast, the defendant here was not in possession of any stolen property, and he was driving in a normal manner when the police spotted him. I also note that in *Franks, supra* at 365, the court said that at the time of a killing, the accused must be engaged in *some act that is required for the full execution of the underlying crime* for the defendant to be considered still in perpetration of that felony. Again, the defendant here was not engaged in some act required for the full execution of a home invasion when the trooper attempted to stop him. The *Salas* court specifically stated that the homicide "was committed before defendant had reached a place of safety while he

(continued…)

6

homeowner had started. It was not, so to speak, a relay in which the baton was handed off from the citizen to the constable. Rather, the defendant here had gotten away cleanly, and no one trying to arrest him had any idea where he was, other than he had to be in an area bounded only by, at most, the limitations of time and the speed of his vehicle. The trooper could only make a stop on the basis of radio-conveyed identifying information, and that is what he did, more than ten miles away from, and more than ten minutes after, the aborted home invasion. In my view, a reasonable person could only conclude that the police were, uncontrovertibly at the point of the attempted stop, not in hot pursuit; rather, they were in the investigation phase of the case, putting together bits of information to try to determine which, if any, of the many motorists, or perhaps nonmotorists, they were observing might be the person who had committed a home invasion. Said another way, when hot pursuit had died ten minutes ago and ten miles away, the police were in the investigatory or "gumshoeing" phase that could produce results now, tomorrow, or perhaps never. That makes all the difference and must mean that the crime of home invasion was over, i.e., had been completed, when the defendant was driving with the flow of traffic. He had gotten away–at least at that time. The criminal in such a situation, if he or she is ever going to be at a point of temporary safety, is in one when he or she has lost the chasers and has

---

(…continued)

'was in hot flight with the stolen property . . . .'" *Salas, supra* at 823. In contrast, defendant in the case at bar was not in hot flight, and he was not transporting stolen property.

7

slipped into traffic unobtrusively. Said conversely, if apprehension in the investigatory stage does not establish that the defendant was at a point of temporary safety, when would the defendant be? The majority has no answer that satisfies me.

Whether a defendant has reached a place of temporary safety should be based on what the state of the investigation was at the time immediately before the eventual attempt at apprehension. The question that must be asked is: Were the pursuers single-mindedly, without need of additional information, aware of whom they were after and where he was, or were they unclear on these things? If they were unclear and, as here, putting together available information to reestablish the pursuit, the defendant would be in a position of temporary safety.

Here, this defendant, lost among the cars on the highway, was, as a matter of law, in a place of temporary safety. The police had lost the scent and were using other techniques to find him. Thus, he was no longer "in the perpetration of" the crime. Indeed, when defendant refused to stop, he moved on to the new crime of fleeing and eluding, and it was "in the perpetration of" that crime, not the home invasion, that the Ackermans were killed.

Under such circumstances, I believe that the trial court should have granted a directed verdict on the felony-murder charges because the evidence was insufficient that defendant was "in the perpetration of" the home invasion when the Ackermans were killed. Accordingly, the jury's verdict should be reversed.

III

8

In conclusion, the Court of Appeals properly vacated defendant's felony-murder convictions because defendant was no longer "in the perpetration of" first-degree home invasion when the Ackermans were killed. I believe the home invasion ended as a matter of law when defendant reached a point of temporary safety, i.e., driving unnoticed and unpursued in traffic. It was only after defendant had reached this point of temporary safety that defendant was spotted by the state trooper and fled when the trooper attempted to stop defendant. Given that fleeing and eluding is not an enumerated felony under our felony-murder statute, the felony murder charges should have been dismissed as a result of defendant's motion for directed verdict. Thus, defendant was improperly convicted of felony murder.[5]

Clifford W. Taylor
Michael F. Cavanagh
Marilyn Kelly

---

[5] I agree with the Court of Appeals that defendant could be charged with second-degree murder regarding the Ackermans' deaths, but not felony murder.

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

V                                            No.  127194

JOHN ALBERT GILLIS,

      Defendant-Appellee.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur with the opinion written by Chief Justice Taylor.  I write separately only to reiterate my belief that when the evidence produced at a preliminary examination is legally insufficient to support binding a defendant over for trial, the defendant is entitled to automatic reversal.  See *People v Hall*, 435 Mich 599, 616-629; 460 NW2d 520 (1990) (Cavanagh, J., dissenting).  The inquiry is not dependent on whether the defendant nonetheless received a fair trial.

                                    Michael F. Cavanagh
                                    Marilyn Kelly