COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

STACY LYNN RADTKE,

      Defendant-Appellant.

UNPUBLISHED
April 26, 2016

No. 325332
Berrien Circuit Court
LC No. 2013-015762-FH

Before: SAAD, P.J., and BORRELLO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of one count of assaulting, resisting, or obstructing a police officer, MCL 750.81d(1). The jury acquitted defendant of two additional counts of resisting and obstructing a police officer, MCL 750.81d(1), two counts of misdemeanor assault and battery, MCL 750.81(1), and one count of misdemeanor domestic assault, MCL 750.81(2). On October 15, 2013, the trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to 14 to 48 months imprisonment. Defendant was also ordered to pay a $500 fine, $1,000 in court costs, $68 in state costs, and a victim's rights assessment of $130. She received credit for 89 days served. This Court granted defendant's delayed application for leave to appeal her conviction and sentence.[1] For the reasons set forth in this opinion, we affirm defendant's conviction, but remand for a *Crosby*[2] hearing in accordance with *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).

A. FACTS

This appeal arises out of a drunken altercation that began at Kevin Ferguson's house in Niles, Michigan. Kevin, who is defendant's brother, lived with his girlfriend Cassie Borowski, Kevin's16-year-old son, and Borowski's eight-year-old son. On June 13, 2013, defendant and her boyfriend Ronald Moffit went to Kevin's home. Borowski testified that at some point Moffit and defendant began arguing. According to Borowski, everything "kind of calmed down," and

---

[1] *People v Radtke*, unpublished order of the Court of Appeals, entered April 28, 2015 (Docket No. 325332).

[2] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

they continued to hang out. However, she testified that things eventually escalated again in the back yard.

According to Borowski, Moffit was sitting on the porch with his feet hanging over the edge, and defendant approached him and hit him in the face with a closed fist while they were arguing. Borowski testified that Moffit did not hit defendant back, that Kevin told them to stop fighting, and that she told defendant to leave. Borowski testified that defendant said, "Do you want to go?" Borowski stated, "[y]es, I want you to go," and defendant jumped on her "like a monkey," "wrapped around" her, and pulled her hair. Borowski testified that she pulled defendant's hair to get her off and defendant finally let go. Borowski further testified that she went to the front yard, and that Kevin took defendant inside the house, and that Moffit eventually left in his vehicle.

Thereafter, Borowski heard Tonya Baker, a friend who was at the home, scream and she saw that defendant had a hold of Baker's hair. Kevin testified that defendant did not do anything violent to Baker and did not hurt Baker. Borowski testified that she was able to separate Baker and defendant. Borowski, Kevin and Baker then departed the residence in a vehicle and called the police from a nearby parking lot.

At approximately 9:40 p.m., officers Denton Fitz and Nathan Adamczyk arrived at the scene. After running a LEIN check, the officers determined that defendant was on probation and they decided to arrest her because she appeared intoxicated, which was a violation of the terms of her probation. Adamczyk handcuffed defendant without issue and began to walk defendant out of the house; defendant "stiffen[ed] up and pushe[d] back against" him. Adamczyk further testified that he told defendant to "stop" and that defendant "continued to push backwards on [him]" as they approached the front steps of the house. According to Adamczyk, he "ke[pt] walking her," and defendant went "down the steps finally."

After going down the steps, they approached Fitz's patrol car. Adamczyk testified that he handed defendant over to Fitz, who had the rear driver's side door of the car open. Adamczyk further testified that Fitz then went to put defendant in the car, that she would not get in the car and that Fitz told her several times to get in the car. According to Adamczyk, defendant did not comply so he went to the other side of the police car to grab defendant and pull her into the backseat. Adamczyk testified that he had "to crawl in the back of the car," which had "hard, plastic seats [that] [were] not easy to get in," that he grabbed defendant's hips, and that Fitz tried to push the "center" of defendant "so that [she] w[ould] fold and go in" the car. Fitz testified that he pushed defendant down and that Adamczyk "drug her" into the car. According to Adamczyk, defendant started to sit down as Fitz pushed her into the car and she then began kicking Fitz. Adamczyk testified that defendant kicked Fitz several times. Fitz testified that he was not injured, and Adamczyk testified that it was a chaotic moment and that defendant was screaming, yelling, and kicking. The officers eventually shut the door to the cruiser and drove to the police station.

Adamczyk testified that the police cruisers had a front-facing and a rear-facing camera that record video and audio, that the rear-facing camera focuses on the backseat, and that a button had to be pressed to activate the camera for the backseat. When he was asked why there was not a tape of defendant being placed into the back of the police car, Fitz testified: "well first

of all, to tape her placing her in the car would be very difficult, because I would have to disengage from her -- somebody has to go in the front of the car and manually switch it to the rear camera. It doesn't just automatically do that." Fitz further testified that he thought he pushed the button on the way back to the law enforcement complex, but either he did not push the button or the button did not engage or "catch."

While Fitz and Adamczyk placed defendant into the police car, Borowski waited outside and she saw that defendant was "very upset" when the police brought her outside the house. Borowski saw defendant kick near one of the police officer's chest or stomach area and observed that defendant was "struggling" while getting into the police car.

Fitz testified that defendant was highly agitated and screaming at him on the way to the police station. Fitz explained that, when he removed defendant from his vehicle, she stiffened up and forcefully pushed back as they were walking, that she was resisting, and that he "utilized what is known as a scalp drag," which was a technique to control and escort someone. Fitz testified that he was frustrated and that, when he engaged the scalp drag technique, he told defendant, "Bitch, I am going to knock your head off," and walked her in. According to Fitz, defendant continued to resist, but she ultimately quit resisting once he "pinned her against the wall" and said, "we are done." Fitz testified that defendant calmed down, but when he and Adamczyk went to take her property, defendant failed to follow the instructions and began to resist again. Defendant eventually had a change of demeanor, and Fitz booked defendant and put her in a cell block.

Shortly thereafter, dispatch called Fitz to inform him that defendant was harming herself inside the cell. Fitz testified that defendant "started whamming her head against the cell block." Fitz further testified that they called "a female reserve officer" called "Sisk" for help and that he removed defendant from her cell. According to Fitz, he was talking to defendant, and she "just literally lunged forward and smashed her face against the floor." Fitz testified that he told defendant that she needed to stop hurting herself, that Sisk was able to talk to defendant until "she came back down," and that there was no further resistance after that incident.

At trial, the prosecution presented the evidence summarized above through the testimony of Borowski, Kevin, Adamczyk, and Fitz. In addition, the prosecution presentenced the testimony of Jim Millin, the Chief of Police for the Niles City Police Department, who testified regarding the recording capabilities at the law enforcement complex and the procedures for obtaining recordings. Specifically, Millin testified that the recording is on a continuous loop and that, after approximately 12 days, the recordings are written over. There was no request for the recording at the police station and it was recorded over. During cross-examination, defense counsel implied that the police destroyed or failed to preserve video recording of the incident inside the police car and at the police department.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## B. ANALYSIS

### I. POLICE RECORDINGS/JURY INSTRUCTIONS

Defendant first argues that she was denied due process when the prosecution suppressed and the police destroyed evidence and when the trial court refused to provide a special jury instruction.

At trial, defendant preserved her argument relating to the jury instruction by requesting it, *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011), but she did not argue that her due process rights were violated by the destruction of evidence or that a *Brady*[3] violation occurred based on the suppression of evidence. Thus, her argument that her due process rights were violated based on the destruction or suppression of evidence is unpreserved. *Id*.

"We review jury instructions in their entirety to determine if error requiring reversal occurred." *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001). "Jury instructions that involve questions of law are [] reviewed de novo. . . . But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (quotation marks and citations omitted). With respect to defendant's unpreserved due process arguments, we review them for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 762-765; 597 NW2d 130 (1999).

With respect to the suppression of evidence, defendant argues that the prosecution failed to preserve police recordings from the cruiser and the police department. Defendant also appears to argue that the prosecution or the police destroyed the evidence.

Regardless of good or bad faith, a due process violation may be established if the prosecution suppresses favorable evidence. *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014). "The Supreme Court of the United States held in *Brady* that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. To establish a *Brady* violation, a defendant must show that: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Id*. at 150.

On the other hand, to warrant reversal on a claimed due process violation involving the failure to preserve or the destruction of evidence, "a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). When the evidence is shown only to be "potentially useful," failure to preserve the evidence does not amount to a due process violation unless bad faith can be shown. *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333, 337; 102 L Ed 2d 281 (1988). A "[d]efendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

---

[3] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

With respect to the recording from the police department, evidence showed that the recording was recorded over after 12 days. To the extent defendant argues that police should have preserved the recording, her argument fails where defendant cannot show that the recording was exculpatory. *Hanks*, 276 Mich App at 95. Here, there was testimony that defendant resisted the officers at the police department and she refused to cooperate and pushed back against an officer. Given the testimony and the fact that there was no testimony to the contrary, defendant has not established that the recording would have been favorable to her—let alone exculpatory as required under *Youngblood*, 488 US at 58 and *Hanks*, 276 Mich App at 95. Thus, to prevail on her argument, defendant was required to prove that the police acted in bad faith when they failed to preserve the recording. *Hanks*, 276 Mich App at 95. Defendant has failed to do so.

"[T]he routine destruction of taped police broadcasts, where the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal." *Johnson*, 197 Mich App at 365. Here, there is nothing in the record to demonstrate bad faith where the recording continuously looped, so there was approximately a 12-day window to recover a recording before the information was automatically recorded over. The police officer testified that he did not make a request to preserve the recording and that he "didn't even think of" requesting the recording in this case and the prosecutor noted at trial that the recording was already written over when she requested the video. There is nothing in the record to support that the officers acted in bad faith. *Hanks*, 276 Mich App at 95; *Johnson*, 197 Mich App at 365. Moreover, defendant has failed to establish the requisite for a *Brady* violation. Here, the prosecution simply did not suppress the recording; the recording did not exist when the prosecutor requested it.

Defendant argues that evidence was suppressed or destroyed because the rear-facing camera in the patrol car used to transport her was not turned on and thus, no video was made. There was no *Brady* violation related to a recording that was never made because this evidence clearly did not exist. Thus, the prosecution did not suppress this non-existent recording. See *Chenault*, 495 Mich at 149-150 (explaining that the prosecution must suppress evidence to establish a *Brady* violation). Moreover, a claim that the police failed to preserve or destroyed this non-existent evidence is wholly without merit. A defendant's due process rights are not violated "when the police fail to use a particular investigatory tool." *Youngblood*, 488 US at 58-59. This "situation [] is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests." *Id*. at 59. See also *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003) (explaining that due process does not "require that the prosecution seek and find exculpatory evidence"). The officers were not required to create a video of the patrol car. Thus, because the recording did not exist, defendant cannot meet her burden of showing that this non-existent recording was exculpatory or destroyed in bad faith. There was no due process violation in this respect, *Youngblood*, 488 US at 58-59, and defendant has not established plain error. *Carines*, 460 Mich at 762-765.

Next, defendant argues that the trial court erred when it refused to give the following jury instruction that defense counsel obtained off of the Internet:

> If you find that any of the missing evidence was significant and not
> adequately explained, you may consider whether the missing evidence tends to

affect the quality, reliability, or credibility of the evidence actually presented to you by the Prosecution. All of these considerations involve factual determinations that are entirely up to you, and you are free to give this matter whatever weight, if any, you deem appropriate based on all the circumstances.

The trial court denied defendant's request for the instruction, noting it was not a standard jury instruction, and explaining that "[in] Michigan, the courts have held uniformly, absent intentional suppression or a showing of bad faith, loss of evidence which occurs before any defense request for it does not mandate reversal." In rendering its holding, the trial court found that there was nothing to support that the destruction of evidence was intentional. The trial court further explained that there was not a request for preservation of the police department recording and that the recording was subsequently lost. The trial court concluded by stating that defendant was free to argue that the police were negligent in failing to preserve the recordings, but it would not give a special instruction.

At trial, the jury heard testimony that the police failed to record the incident in the backseat and that the recording from the police department was not preserved. The court also instructed the jury that it was free to consider all of the evidence in determining the credibility of the witnesses. Defendant was free to argue that the missing recordings were potentially exculpatory and that the police were negligent and the jury was able to consider the lack of recordings in making its determination. Moreover, as noted above, there was no bad faith with respect to this evidence. Thus, the trial court's instructions "fairly presented the issues to be tried and sufficiently protected the defendant's rights," *Aldrich*, 246 Mich App at 124, and the trial court did not abuse its discretion in determining that the special jury instruction was not warranted on the facts of the case. *Gillis*, 474 Mich at 113.

Finally, in a related argument, defendant contends that there were several res gestae witnesses "whom the prosecutor admittedly made no attempt to produce." However, a prosecutor is not required to produce all res gestae witnesses; rather, it need only identify known witnesses and provide reasonable assistance to locate them on defendant's request. *People v Perez*, 469 Mich 415, 419; 670 NW2d 655 (2003). Defendant's argument lacks merit.

## II. SCORING OF THE OVs

Next, defendant argues that Offense Variables (OV) 9 and OV 12 were improperly scored and that defense counsel was ineffective for failing to object to the scoring of these OVs.

With respect to the scoring of the guidelines, "[a] trial court's scoring of OVs must be supported by a preponderance of the evidence," and this Court "review[s] the trial court's findings of fact for clear error." *People v Jackson (On Reconsideration)*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 322350, issued December 3, 2015); slip op at 11, citing *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

The trial court scored OV 9 at 10 points. MCL 777.39(1)(c) governs the scoring of OV 9 and directs a trial court to assess 10 points upon a finding that "2 to 9 victims [] were placed in danger of physical injury." The statute defines "victim," to include "each person who was placed in danger of physical injury or loss of life or property. . . ." MCL 777.39(2)(a).

The jury convicted defendant of count 2, which involved her conduct when officers Fitz and Adamczyk placed her in the police cruiser. Both officers were "placed in danger of physical injury." Defendant repeatedly kicked Fitz, placing him in danger of a physical injury. While Adamczyk was uninjured, he was placed in danger of a physical injury when defendant's actions required him to intervene and assist Fitz in placing her into the police car. By intervening and assisting Fitz, Adamczyk was "placed in danger of injury" and was properly considered a "victim" under MCL 777.39. Accordingly, the trial court did not err in scoring OV 9 at 10 points.

The trial court also scored OV 12 at 10 points. MCL 777.42(1)(b) governs the scoring of OV 12 and requires a court to assess 10 points upon a finding of "[t]wo contemporaneous felonious criminal acts involving crimes against a person." MCL 777.42(1)(b). In accordance with MCL 777.42(2)(a), "[a] felonious criminal act is defined to be contemporaneous if the act occurred within 24 hours of the sentencing offense and will not result in a separate conviction." *People v Light*, 290 Mich App 717, 722; 803 NW2d 720 (2010) (quotation marks and citation omitted). Thus, "when scoring OV 12, a court must look beyond the sentencing offense and consider only those separate acts or behavior that did not establish the sentencing offense." *Id*. at 723.

Resisting or obstructing a police officer is a felony. MCL 750.81d(1). Further, it is a crime against a person. MCL777.16d. Thus, OV 12 was properly scored at 10 points where there were "[t]wo contemporaneous felonious criminal acts involving crimes against a person." MCL 777.42(1)(b). The three counts of resisting or obstructing an officer all occurred within the same evening, MCL 777.42(2)(a)(*i*), and the two counts that defendant was found not guilty of did "not and will not result in a separate conviction," MCL 777.42(2)(a)(*ii*). Thus, the two felonious criminal acts involving crimes against a person were contemporaneous. MCL 777.42(2)(a).

On appeal, defendant's only argument with respect to OV 12 is that the scoring was improper because she was acquitted of the other two resisting and obstructing charges. It is correct that "[a] sentence is invalid when it is based on improper assumptions of guilt," "[b]ut this is because a sentence must be based on accurate information." *People v Golba*, 273 Mich App 603, 614; 729 NW2d 916 (2007). When sentencing a defendant, however, "[a] trial court may consider facts concerning uncharged offenses, pending charges, *and even acquittals*, provided that the defendant is afforded the opportunity to challenge the information and, if challenged, it is substantiated by a preponderance of the evidence." *Id*. (emphasis added). Thus, the scoring of OV 12 may be supported by felonious acts for which a defendant was acquitted. See *Golba*, 273 Mich App at 614.

Here, defendant had an opportunity to challenge the facts surrounding her acquittals at sentencing. However, she did not do so. Further, while defendant makes no argument that a

-7-

preponderance of the evidence did not support the scoring of OV 12, a review of the record supports the scoring.

There are two elements for resisting or obstructing a police officer under MCL 750.81d(1): "(1) the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer, and (2) the defendant knew or had reason to know that the person that the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties." *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014) (quotation marks and citation omitted).

Here, count 1 involved Adamczyk's initial arrest of defendant and his attempt to escort her out to the patrol vehicle. Adamczyk testified that, as he started to escort defendant, who was handcuffed, out of the house, "she stiffen[ed] up and pushe[d] back against" him. Adamczyk further testified that he told her to stop and that defendant "continued to push backwards on [him]" as they approached the steps. According to Adamczyk, he "ke[pt] walking her," and defendant went "down the steps finally." Thus, defendant obstructed Adamczyk because she knowingly failed to comply with a lawful command and used physical interference when she continued to push back and resist his movement, MCL 750.81d(7)(a), and the first element was satisfied, *Quinn*, 305 Mich App at 491.

Next, "defendant knew or had reason to know" that Adamczyk was a police officer performing his duties because he was wearing his police uniform and placed her under arrest after administering a preliminary breath test. Thus, the second element was also satisfied. *Id*. Therefore, for these reasons, despite the fact that the jury did not find these facts beyond a reasonable doubt, a preponderance of the evidence supported scoring this felonious criminal act under OV 12. *Jackson (On Reconsideration)*, ___ Mich App at ___; *Golba*, 273 Mich App at 614.

Next, count 3 involved "the incident at the law enforcement complex." Fitz testified that defendant was "pulling and the pushing," "not complying," and resisting when he took her into the police department. Fitz further testified that he resorted to a "scalp drag" to try to control defendant's body and walk. However, Fitz testified that defendant continued to pull and push, but defendant "ultimately quit" when he "pinned her against the wall" and said that they were "done." According to Fitz, defendant calmed down, but, when they went to take her property, defendant failed to follow the instructions and began to resist again. Eventually, defendant was placed in a cell block but "started whamming her head against the cell." Fitz testified that they called "a female reserve officer" [later identified as Sisk] for help, that he removed defendant from her cell, and that she "lunged forward and smashed her face against the floor" while he was talking to her. These facts support that defendant physically interfered with and resisted Fitz. *Quinn*, 305 Mich App at 491.

Similarly, a preponderance of the evidence supported that "defendant knew or had reason to know" that Fitz was a police officer performing his duties because he was wearing his police uniform and because she was taken to the law enforcement complex in the back of a police car. Thus, the second element was also satisfied. *Id*. Therefore, for these reasons, despite the fact that the jury did not find these facts beyond a reasonable doubt, a preponderance of the evidence

supported scoring this felonious criminal act under OV 12. *Jackson (On Reconsideration)*, ___ Mich App at ___; *Golba*, 273 Mich App at 614.

In sum, because "two contemporaneous felonious criminal acts involving crimes against a person were committed," the trial court properly scored OV 12 at 10 points. MCL 777.42(1)(b). In addition, given our conclusion that OV 9 and OV 12 were properly scored, defense counsel was not ineffective for failing to object. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.")

Finally, defendant argues that the trial court improperly departed from the sentencing guidelines recommended minimum sentencing range. This argument lacks merit.

The trial court sentenced defendant within the applicable guidelines range and did not actually depart. Here, defendant's total OV score was 35 points. Her total Prior Record Variable (PRV) score was 15 points. The offense of assaulting, resisting, or obstructing a police officer, MCL 750.81d(1), is a Class G offense under the sentencing guidelines. MCL 777.16d. Accordingly, defendant's total OV score of 35 points placed her in OV Level III, and her total PRV score of 15 points placed her in PRV Level C. MCL 777.68. Thus, under the legislative guidelines, defendant's recommended minimum sentence range was 0 to 17 months. MCL 777.68. However, because defendant was being sentenced as a third-offense habitual offender, MCL 769.11, the trial court increased the upper limit of the recommended minimum sentence range by 50 percent. MCL 777.21(3)(b). This resulted in a minimum sentence range under the legislative guidelines of 0 to 25 months. Therefore, the trial court sentenced defendant within the recommended guidelines range to 14 to 48 months' imprisonment.

## III. PSIR

Next, defendant argues that the PSIR contains improper information concerning prior drug use and information about her acquittals. Defendant did not object to the PSIR at sentencing; therefore, our review is for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 762-765.

A defendant has a "due process right to the use of accurate information at sentencing." *People v Daniels*, 192 Mich App 658, 675; 482 NW2d 176 (1991); MCL 771.14. Here, defendant has failed to demonstrate that the PSIR contains inaccurate information. Defendant argues that the PSIR does not correctly reflect the time period when she quit using two drugs. However, the PSIR clearly states that her involvement with these drugs was for a short and unspecified period of time, which was in the past. This was not erroneous information.

Defendant also argues that information related to her acquittals should not be in the PSIR. However, defendant faced various charges for which the jury found her not guilty. This is undisputed and an accurate portrayal of the circumstances surrounding defendant's conviction. See MCR 6.425(A)(1)(b). Defendant has not established plain error in the inclusion of this information in her PSIR. *Carines*, 460 Mich at 762-765.

## IV. COURT COSTS

Next, defendant argues that the trial court failed to articulate a factual basis for the $1,000 in court costs and that this amount was unreasonable. We review this unpreserved argument for plain error affecting defendant's substantial rights. *People v Konopka (On Remand)*, 309 Mich App 345, 356; 869 NW2d 651 (2015).

Defendant's felony trial occurred in the Berrien Circuit Court, and the Berrien Circuit Court imposed $1,000 in court costs. In *People v Sanders (After Remand)*, 298 Mich App 105, 108, 825 NW2d 376 (2012), after the Berrien Circuit Court provided information regarding costs, this Court held that it was "satisfied that the trial court complied with our directives on remand and did establish a sufficient factual basis to conclude that $1,000 in court costs under MCL 769.1k(1)(b)(*ii*) is a reasonable amount in a felony case conducted in the Berrien Circuit Court." Because this Court has specifically held that $1,000 in court costs was a reasonable amount for a felony case handled in the Berrien Circuit Court, *id.*, defendant has not demonstrated a plain error, *Carines*, 460 Mich at 763. See also MCL 769.1k(1)(b)(*iii*), as amended by 2014 PA 352 (providing for "any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case"). Therefore, defendant is not entitled to a remand for determination of the reasonableness of the $1,000 court costs.

## V. *LOCKRIDGE*

Finally, defendant argues that she is entitled to resentencing because the trial court engaged in impermissible judicial fact finding in the scoring of her sentencing guidelines. We review this unpreserved claim of error for plain error affecting defendant's substantial rights. *Lockridge*, 498 Mich at 392.

Here, the facts necessary to establish 10 points under OV 9 (number of victims), MCL 777.39, and 10 points under OV 12 (contemporaneous felonious criminal acts), MCL 777.42, "were not established by the jury's verdict or admitted by the defendant, and yet those facts were used to increase the defendant's mandatory minimum sentence, violating the Sixth Amendment." *Id.* at 393. That is, because those facts established the guidelines' minimum sentence, "an unconstitutional constraint [on the judge's discretion] actually impaired the defendant's Sixth Amendment right." *Id.* at 395. Accordingly, defendant is entitled to a remand for a *Crosby* hearing to determine whether the trial court would have imposed the same sentence had it been aware that its discretion was not constrained by the guidelines pursuant to the procedure outlined in *Lockridge*. See *id.* at 395-398. We note, however, that "defendant may elect to forego resentencing by providing the trial court with prompt notice of [her] intention to do so" due to the possibility that defendant may receive a more severe sentence on remand. *People v Stokes*, ___Mich App___; ___NW2d___ (2015) (Docket No. 321303) (slip op at 11-12).

We affirm defendant's convictions, but remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Henry William Saad
/s/ Stephen L. Borrello
/s/ Michael F. Gadola