*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMAR TERRELLE PURDLE,

        Defendant-Appellant.

UNPUBLISHED
February 1, 2022

No. 353821
Kent Circuit Court
LC No. 19-003606-FC

Before: CAMERON, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant, Jamar Purdle, appeals as of right his jury trial conviction of second-degree murder, MCL 750.317, carrying a concealed weapon, MCL 750.227, felon in possession of a firearm, MCL 750.224f, and two counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Purdle as a fourth-offense habitual offender, MCL 769.12, to serve 680 to 960 months' incarceration for the second-degree murder conviction, 60 to 180 months' imprisonment each for the convictions of carrying a concealed weapon and felon in possession, and two years' imprisonment for the felony-firearm convictions, to be served consecutive to the other sentences. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On March 31, 2019, Mikeya Day was shot dead. The prosecution presented evidence that prior to Day's death, she and Purdle travelled to a residence on Hancock Street in Grand Rapids. Day's uncle called her while Purdle was outside the vehicle, and Day asked him to "hold" just before Purdle returned. As a result, he was on the line when Day was shot. He testified that Day and Purdle got into an argument over drugs and money. During the argument, Day demanded that Purdle give her money and drugs and that he leave the vehicle. Purdle refused. As the argument escalated, Day's uncle heard a struggle followed by Day saying, "You ain't going to do me like that." He stated that it sounded like the phone was dropped, and, after that he overheard Purdle say "Fuck you" just before he heard a loud noise. Later, he learned that the noise had been a gunshot.

Surveillance footage from a nearby residence showed Day exiting the driver's side door and staggering across the street. Purdle got out of the front passenger side door at the same time. He reached back into the vehicle as if to pick something up and then walked out of view of the camera. Takeah Hill, a resident of one of the houses, testified that Purdle had been at her home approximately eight minutes before the shooting. She stated that he returned, banged on the door, and told her that Day had shot herself. The surveillance footage shows Purdle returning to usher Day, who appears to be covered in blood from her neck to her waist, back into the vehicle. When Day exited the vehicle again, Purdle put her back inside and then drove away.

Day's uncle recalled that after hearing the gunshot, it was quiet for two or three minutes and then he heard the doors slam a couple of times. He heard Day say that she thought she was dying and that she could not breath. Purdle told her she was not going to die. He also said, "Tell them that we got robbed, we got robbed," three or four times. Day's uncle heard sounds of traffic, so he surmised that they were driving to a hospital. He stated that he yelled, but no one responded to him so he eventually hung up and called hospitals in the area to find where Day had been taken.

Purdle brought Day into the emergency department. He told a nurse that Day had been shot and suggested that he might have also been shot. The nurse examined Purdle and determined that he had not been shot. She stated that, over approximately 30 minutes, Purdle made a number of statements regarding the shooting. First, he explained that he and Day were in a car preparing to purchase marijuana when the person they were going to purchase the marijuana from attempted to rob them. Purdle said that he tried to push the gun away, but it went off. The second time Purdle explained what happened, he stated that he was outside the vehicle and tried to push the gun away when it went off. In his third version, Purdle said that the gun discharged while he "tussled" with a person who was trying to sell him a gun.

In the meantime, a police sergeant investigating the shooting was informed that a bullet had entered Day's right cheek and exited the left side of her throat. Determining that the shot could have been fired while Purdle was sitting in the passenger seat, the sergeant went to speak to another officer, who was talking to Purdle in a small room. While they were discussing things outside the room, Purdle fled. He was located in the stairwell, "frantically pulling on the [locked] doors" to other floors. After his arrest, Purdle told the police that he and Day were attempting to sell a gun to a person near downtown Grand Rapids, and the gun accidentally went off when Purdle handed it to the person through the passenger side window. When the detectives suggested that the gun was in Purdle's hand when it was fired, Purdle insisted that it was in the hand of the unknown third person. When the detectives suggested that Purdle shot Day and that there was an argument in the car, Purdle denied that there was an argument. Purdle did not tell the detectives what happened to the gun, and the gun was never recovered.

At trial, Purdle testified that Day attempted to rob him at gunpoint. He stated that he handed her drugs and when she demanded his phone, he dropped it in an attempt to distract her so he could escape. When she demanded his diamond-studded sunglasses, he went to remove them from his neck and Day lurched her body away from him. He testified that in the process the gun when off and Day accidentally shot herself. Believing he had been shot, he got out of the vehicle and then reached back in to get a liquor bottle. He testified that when he saw the blood in the driver's seat, he realized that Day had shot herself. Purdle recounted that once he realized Day had shot herself, he got her back into the vehicle so he could take her to the hospital. He stated

that while they were heading to the hospital, Day threw what sounded like a gun and some drugs out of the window and then she concocted a plan to tell people that she had been shot when some other third person tried to rob them.

## II. OTHER-ACTS EVIDENCE

### A. STANDARD OF REVIEW

Purdle argues that the trial court abused its discretion by admitting other-acts testimony from his ex-girlfriend, Arianna Brewer, under MCL 768.27b. This Court reviews for an abuse of discretion a trial court's decision to admit evidence. *People v Solloway*, 316 Mich App 174, 191-192; 891 NW2d 255 (2016). "An abuse of discretion is found when the trial court's decision falls outside the range of reasonable and principled outcomes." *Id.* "[A] court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Ackerman*, 257 Mich App 434, 442; 669 NW2d 818 (2003).

### B. ANALYSIS

"Generally, under MRE 404(b), evidence of other crimes, wrongs, or acts of an individual is inadmissible to prove a propensity to commit such acts." *People v Propp*, ___ Mich ___, ___; ___ NW2d ___ (2021) (Docket No. 160551); slip op at ___ (quotation marks and citation omitted). However, under certain circumstances, MCL 768.27b "expands the admissibility of domestic-violence other-acts evidence beyond the scope permitted by MRE 404b(1) . . . ." *Id.*, quoting *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012). MCL 768.27b(1) provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under [MRE 403]." Additionally, "rules of evidence not specifically mentioned in MCL 768.27b may nevertheless be considered when determining whether evidence is admissible." *Propp*, ___ Mich at ___; slip op at ___.

In this case, MCL 768.27b(1) governs the admissibility of Brewer's testimony. Purdle was accused of an offense involving domestic violence because he was in a dating relationship with Day and was accused of causing her physical harm by murdering her. See MCL 768.27b(6)(a)(*i*); MCL 768.27b(6)(b)(*iv*). Likewise, the incident with Brewer was an act of domestic violence because she was in a dating relationship with Purdle when he made her afraid by displaying a gun during an argument. See MCL 768.27b(6)(a)(*iv*); MCL 768.27b(6)(b)(*iv*).

On appeal, Purdle argues that Brewer's testimony should have been excluded under MRE 403. Evidence may be excluded under MRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "As with any balancing test, MRE 403 involves two sides of a scale—a probative side and a prejudicial side." *People v Watkins*, 491 Mich 450, 486; 818 NW2d 296 (2012). In order to effectuate the policy underlying MCL 768.27b, evidence allowed under that statute must be weighed more heavily for its probative value than for its prejudicial effect. See *id*. at 487; *Mack*,

493 Mich at 3.[1]  When determining whether other-acts evidence admissible under MCL 768.27b is inadmissible under MRE 403, the trial court may consider the following illustrative list of factors:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Id*. at 487-488; *Mack*, 493 Mich at 3.]

On appeal, Purdle argues that the other-acts testimony was dissimilar from the charged crime because Brewer did not testify that he pointed a gun at her.  However, the conduct does not need to be identical.  Brewer's testimony indicated that she was in a dating relationship with Purdle, that she got into an argument with him, and that in response to the argument he pulled out a gun.  Days later, Purdle, who was also in a dating relationship with Day, got into an argument with her and pulled a gun.  In light of the striking similarities between the two acts, and their closeness in time, the mere fact that he did not point a gun at Brewer is not so significant as to warrant exclusion of the other-acts evidence.

On appeal, Purdle argues that Brewer's testimony is unfairly prejudicial because it places a gun in his hands before the shooting.  Yet, although prejudicial to Purdle's case, that fact alone does not mean that there was a danger of unfair prejudice.  "Any relevant testimony will be damaging to some extent." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995) (quotation marks and citation omitted).  Evidence is not, therefore, unfairly prejudicial merely because it is damaging to the defendant's case.  Instead, "the idea of prejudice denotes a situation in which there exists a danger that marginally probative evidence will be given undue or pre-emptive weight by the jury." *Id*. (quotation marks and citation omitted).  Evidence may also be unfairly prejudicial if "it would be inequitable to allow the proponent of the evidence to use it." *Id*. (quotation marks and citation omitted).  Here, the other-acts of domestic violence evidence is not marginally probative; instead, it is significantly probative both of the fact that Purdle had a gun just days before the shooting and that he had a propensity to use it to threaten women he was dating while he was in arguments with them.  Thus, on this record, the trial court did not abuse its discretion by admitting Brewer's evidence under MCL 768.27b(1).

### III. JURY INSTRUCTIONS

### A.  STANDARD OF REVIEW

Purdle next argues that the trial court erred by denying his requests for jury instructions on accident and involuntary manslaughter.  This Court reviews de novo claims of instructional error. *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019).  "[T]he trial court's determination

---

[1] In *Mack*, our Supreme Court held that, although *Watkins* addressed MCL 768.27a, "the reasoning of *Watkins* fully controls" with regard to the admissibility of other-acts evidence under MCL 768.27b. *Mack*, 493 Mich at 3.

whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (quotation marks and citation omitted).

## B.  ANALYSIS

### 1.  ACCIDENT

Purdle's lawyer requested that the jury be instructed on both accident and involuntary manslaughter. However, he subsequently agreed that it was not appropriate to instruct the jury on accident. By expressly agreeing that the accident instruction was not appropriate, Purdle waived review of this issue and we decline to address it further. See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) (holding that defendant's challenge to the jury instruction was waived by his lawyer's explicit and repeated approval of the instruction given); see also *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (stating that waiver extinguished any claim of error, leaving nothing for this Court to review).

### 2.  INVOLUNTARY MANSLAUGHTER

Next, Purdle argues that the jury should have been instructed on involuntary manslaughter. A defendant is entitled to a properly instructed jury. *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). A trial judge must instruct the jury as to the applicable law, and fully and fairly present the case to the jury in an understandable manner. *People v Moore*, 189 Mich App 315, 319; 472 NW2d 1 (1991). "[W]hen a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge." *Mills*, 450 Mich at 81.

In this case, an involuntary manslaughter instruction was not supported by the evidence. During his initial interview with police, Purdle claimed that Day was shot accidentally by an unknown person during an attempt to sell a gun. Purdle provided a nurse with a similar version of the shooting. Those versions of his story, however, were disproven by the video that showed no third person near the car. Thus, Purdle testified at trial that Day accidentally shot herself during an attempt to rob him, whereas the prosecution's theory was that Purdle shot Day with malice. Purdle appears to suggest that a jury could have believed the various aspects of the prosecution's theory that tended to show that Purdle held the gun as Day was shot, combined with the aspects of Purdle's testimony that he did not intentionally kill Day, such that an instruction on manslaughter must have been given. Yet, Purdle has not shown that any rational view of the evidence could support a conclusion that he had a gun and pointed it at Day's face and shot her, with something less than malice. Consequently, the trial court did not err by declining to instruct the jury on involuntary manslaughter.

## IV. SENTENCE

## A.  STANDARD OF REVIEW

Purdle also argues that he is entitled to resentencing because his 56-year minimum sentence is not proportionate to the circumstances or those of the offense. He also argues that his minimum sentence amounts to a de facto life sentence and constitutes cruel or unusual punishment. This Court reviews for an abuse of discretion whether a trial court imposed a sentence that was

proportionate to the offender and offense for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). A trial court abuses its sentencing discretion when the sentence imposed is disproportionate to the seriousness of the circumstances involving the offense and the offender. *Id*. at 460. Additionally, unpreserved issues of constitutional law are reviewed for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 762-764; 597 NW2d 130 (1999).

## B. ANALYSIS

### 1. PROPORTIONALITY

"[A] sentence within the Legislature's guidelines range is presumptively proportionate." *People v Odom*, 327 Mich App 297, 315; 933 NW2d 719 (2019). Moreover, "[i]f a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." MCL 769.34(10). Contrary to Purdle's argument on appeal, MCL 769.34(10) is still valid and applicable. See *People v Anderson*, 322 Mich App 622, 636; 912 NW2d 607 (2018). Here, Purdle's minimum sentencing guidelines range for second-degree murder was 315 to 1050 months. His sentence of 680 to 960 months, therefore, is within the minimum sentencing guidelines range and is presumptively proportionate. See *Odom*, 327 Mich App at 315.

### 2. CRUEL OR UNUSUAL PUNISHMENT

Purdle contends that his sentence violates constitutional prohibitions against cruel or unusual punishments in his case. The Michigan Constitution prohibits "cruel *or* unusual punishment." Const 1963, art 1, § 16. That prohibition is broader than the one found in the Eighth Amendment of the United States Constitution (prohibiting cruel *and* unusual punishment). *People v Bullock*, 440 Mich 15, 30-32, 41-42; 485 NW2d 866 (1992). The principle of proportionality is applied when determining whether a sentence is cruel or unusual. *Id*. at 33. In Michigan, the test for whether a sentence violates the prohibition against cruel or unusual punishment requires the court to assess:

> (1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in the same jurisdiction, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation. [*People v Carp*, 496 Mich 440, 520; 852 NW2d 801 (2014), vacated sub nom on other grounds by *Carp v Michigan*, 577 US 1186 (2016).]

Purdle argues that the sentence imposed, when considered in conjunction with his age, is a de facto life without parole sentence. He contends that, even when considering the gravity of the offense, his sentence is too severe. We disagree. Although Purdle was convicted of second-degree, not first-degree murder, the offense remains grave. The gravity of the offense of second-degree murder is not decreased by Purdle's age. Day is dead. The gravity of the offense, however, would have been increased had Purdle been convicted of first-degree murder. Under such

circumstances, he would have been sentenced to life without the possibility of parole. In recognition of the difference in severity between first-degree murder and second-degree murder, the trial court imposed a sentence within the guidelines range that allows for the possibility of parole. The fact that, because of Purdle's age, he may die before he can realize that possibility does not make the sentence the legal equivalent of a life sentence without the possibility of parole. See *People v Bowling*, 299 Mich App 552; 830 NW2d 800 (2013) (stating that the defendant's - year minimum sentence for his second-degree murder conviction did not violate the prohibition on cruel or unusual punishments because it was proportionate and he did not present any unusual circumstances to rebut the presumption of proportionality).

Purdle asserts that there are 3,854 people in Michigan serving sentences for second-degree murder, that 1,250 are serving over 25-year sentences, and only 538 are serving life. Purdle will be eligible for parole after serving approximately 56 years for second-degree murder, which is a shorter sentence than the 538 people who are *actually* serving life in prison. As a result, at most, his statistical argument shows that his sentence is not greater than 40% of the people serving sentences for second-degree murder. Therefore, Purdle has not shown that his sentence is unusual when compared to punishment for second-degree murder in Michigan. Nor has Purdle demonstrated that his sentence is severe when compared to sentences for second-degree murder in other jurisdictions. Purdle asserts that there are 162,000 people serving life sentences in the United States at the time of this appeal, and that 50 in 100,000 people are sentenced to life in prison. Yet, Purdle makes no comparison and provides no statistics on murder generally or on second-degree murder specifically. Therefore, he cannot show that the severity of his sentence is out of proportion when compared to other jurisdictions' sentencing for second-degree murder. Lastly, Purdle argues that his sentence forecloses the possibility of rehabilitation. Again, however, his sentence is not actually life without the possibility of parole, so rehabilitation has not been entirely foreclosed to him.

For the foregoing reasons, Purdle has not demonstrated that his sentence is cruel or unusual or out of proportion to the crime he committed. Therefore, he has not shown that he is entitled to relief on this issue.

## V. INEFFECTIVE ASSISTANCE

### A. STANDARD OF REVIEW

Lastly, in a Standard 4 brief, Purdle argues that his lawyer was ineffective by failing to raise a *Batson*[2] challenge and by failing to request funds to retain an expert to investigate and to potentially provide testimony on weapons and gunpowder residue. "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *Solloway*, 316 Mich App at 187. "Generally, a trial court's findings of fact, if any, are reviewed for clear error, and questions of law are reviewed de novo." *Id*. at 188. However, because no evidentiary hearing has been held in this case, this Court's review is limited "to mistakes apparent on the lower court record." *Id*.

---

[2] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed2d 69 (1986).

## B. ANALYSIS

In *People v Stanaway*, 446 Mich 643, 687-688; 521 NW2d 557 (1994), our Supreme Court explained that to prevail on a claim that his lawyer provided ineffective assistance,

> the defendant first must show that counsel's performance was below an objective standard of reasonableness under prevailing professional norms. The defendant must overcome a strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.

Purdle argues that his lawyer was ineffective because he did not raise a *Batson* challenge during jury selection. He contends that such a challenge was warranted because the racial composition of his jury consisted solely of white jurors and that African Americans were stricken from that jury. The record does not support his allegation. Indeed, there is no record of what race any juror or potential juror appeared to be in this case. Accordingly, his assertion that the prosecution improperly used his peremptory challenges to exclude jurors because of their racial appearance is without a factual basis of support. Therefore, Purdle has not shown that his lawyer was ineffective for failing to object. See *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) (stating that a party may not leave it to this Court to search for the factual basis to sustainor reject his position but must support factual statements with specific references to the record).

Purdle further argues that his lawyer was ineffective because he did not request funds for a gunpowder-residue expert. He asserts that "the prosecution expert" stated that "he could detect gun powder residue by visual examination" and that "gun powder residue is something he can see and he can test gun powder residue with his eyes on the entire upper body and face." He does not identify which "prosecution expert" allegedly made those statements, however. We have reviewed the record and cannot find any factual basis for Purdle's contention. Moreover, even if such claims had been made by a prosecution expert, Purdle has provided no factual basis for his claim that another expert could have easily refuted such testimony. Consequently, his assertion that his lawyer ought to have secured a gunpowder expert to refute the claims is not supported by the record.

Affirmed.

/s/ Thomas C. Cameron
/s/ Michael J. Kelly

-8-