*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MONTEZ ANTONIO BROOKS JR.,

Defendant-Appellant.

UNPUBLISHED
April 08, 2025
1:29 PM

No. 369060
Washtenaw Circuit Court
LC No. 21-000462-FC

Before: YATES, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

Defendant, Montez Antonio Brooks Jr., shot and killed Sonni Green in an act of retaliation. A jury convicted defendant of first-degree murder, MCL 750.316; carrying a concealed weapon, MCL 750.227; felon in possession of a firearm, MCL 750.224f; felon in possession of ammunition, MCL 750.224f(6); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant received a sentence of life imprisonment for the first-degree murder conviction, as well as lesser sentences for the other convictions. On this appeal of right, defendant challenges his convictions, but not his sentences. We affirm.

## I. FACTUAL BACKGROUND

This case involves the shooting death of 20-year-old Sonni Green on June 12, 2020. Police believed that this shooting was in retaliation for a shooting that occurred about six weeks earlier. The prior shooting occurred on April 26, 2020, in the parking lot of a liquor store. Sonni Green, along with his brother, Eli Green, shot and beat a man named David Evans. Evans spent time in intensive care, but survived the gunshot wound.

Much of the evidence about the shooting in this case came from the testimony of Damaris Hunter, the mother of defendant's son. Hunter first saw Evans in May 2020, when defendant had a FaceTime call with Evans. During the call, Hunter saw Evans "flashing money" and heard Evans tell defendant, "You gotta get him." She said Evans seemed scared and paranoid. At that time, Hunter and defendant were unemployed and staying in hotel rooms that they funded by borrowing money from friends and family.

-1-

At approximately 11:00 a.m. on June 12, 2020, Hunter and defendant left the hotel where they were staying and drove off in the gray Toyota Corolla that they were renting. They eventually picked up Evans, and Hunter drove around with the men while defendant supplied directions. They briefly stopped at a car wash, and then they went to Rawsonville. There, Evans recognized a car—a Dodge Charger—at a Burger King, but he noted there was no one in the car. Evans and defendant then instructed Hunter to park behind a nearby gas station, which she did.

While they were sitting in the car in the gas-station parking lot, Evans saw a man running across a nearby grassy area and said: "there he goes." Defendant told Hunter to pull up the car. Hunter then pulled out of the parking spot and pulled up past the man Evans referenced. At that point, defendant jumped out of the car and Hunter heard a lot of gunshots coming from right behind the car. Defendant then got back in the car and told Hunter to go, so she drove off. When defendant returned to the car, Hunter saw a firearm in his hand. Defendant was wearing a red bandana at the time of the shooting.

When police officers arrived at the Burger King after the shooting, they found Sonni Green unresponsive in his blue Dodge Charger with multiple gunshot wounds and a significant amount of bleeding. The car was riddled with bullet holes, and there were numerous shell casings on the ground. The evidence indicated that no shots were fired from inside the Charger. An ambulance arrived and transported Green to the hospital, but he eventually died. An autopsy revealed gunshot wounds to his left cheek, left arm, left leg, and left side of his chest, and the cause of his death was multiple gunshot wounds.

After Hunter, Evans, and defendant drove from the scene of the shooting, Hunter dropped off Evans and defendant at separate locations. At defendant's request, Hunter then went to Detroit, ditched the car, and met up with one of defendant's friends, whom Hunter knew only as "Screws." About 20 minutes after Hunter arrived at Screws's house, defendant arrived with another person. At that point, defendant had thousands of dollars. For several days after the shooting, Hunter and defendant stayed in hotel rooms. About four days after the shooting, the police came to the hotel where defendant and Hunter were staying and arrested them. A search of their hotel room revealed a red bandana and a couple of cell phones.

Police officers retrieved security footage from Burger King and two other businesses in the area of the shooting. The video footage from Burger King generally supported Hunter's testimony. It showed a dark-colored sedan come from the direction of the gas-station parking lot and pull up close to Sonni Green's car. At 12:51 p.m., a man can be seen walking towards Green's car. There is a gap in the video, and then it shows a person running towards the dark-colored sedan.

The video footage from the other businesses similarly shows a gray vehicle drive into the gas-station parking lot and pull into a parking space. After a few moments, a person is seen running across a grassy area towards the blue Dodge Charger. When that person gets to the blue Charger, the gray vehicle pulls out and drives directly towards the Charger.

The car Hunter was driving on the day of the shooting—a gray 2017 Toyota Corolla—was a rental car equipped with GPS tracking. Hunter initially told the owner of the rental car company, Azib Haque, that the car had been stolen. Haque then pulled up the GPS data for the car and saw that the car had been idling in an area of Detroit for an hour. Haque spoke to the police and gave

them the GPS data. The police analyzed the GPS data, which revealed that, on June 12, the rental car stopped at a car wash at 12:30 p.m. At 12:47, the car stopped behind a Speedway gas station and idled for 3 and a half minutes before leaving. Five minutes later, at 12:52 p.m., the rental car was on the highway heading east.

Detective Heather Morrison from the Washtenaw County Sheriff's Office was in charge of the investigation of the June 12 shooting. Immediately after the shooting, police officers believed that the shooting may have been in retaliation for the shooting that took place at the liquor store in April. Her investigation was initially guided by a call from a source of information who provided a name of the person believed to be the shooter. Detective Morrison was able to obtain the phone records for phone numbers associated with defendant, Hunter, and Evans. That data showed that calls between defendant and Evans increased in the week leading up to the shooting, with the pair calling one another 13 times during the week preceding the shooting. Detective Morrison was also able to track the location of those phones on the day of the shooting, which generally revealed that the cell phones belonging to Evans, Hunter, and defendant were together on the day of the shooting from approximately 11:35 a.m. until shortly after 1:00 p.m.

During the investigation, Detective Morrison repeatedly interviewed Hunter, who initially told Detective Morrison she knew nothing about the shooting and did not know Evans. She also told the detective that the car had been stolen. But Hunter subsequently admitted she lied when she told police that she did not know anything. She said she lied a few times before she received the investigative subpoena and had to come in to answer questions under oath, at which point she told the truth.

At trial, Hunter acknowledged that she had previously sent letters to the prosecutor and the police recanting the facts she described in her testimony at trial. In one letter, she wrote that she just said what she thought the police wanted her to say. She acknowledged that she initially told the police that she knew nothing about the shooting and was not there, and that she told the police and the car-rental company that the car was stolen.

Hunter said that defendant had been in contact with her since the shooting via video call and e-mail. Defendant asked Hunter not to testify and told her to go on vacation. When defendant learned that Hunter had talked to the police, he told her she needed to fix her mistake. In response to a discussion about how Hunter had spoken with the police, defendant told Hunter that if he was not incarcerated, he would knock out all of her teeth. He told Hunter to tell the police that a man named "Saucepack" stole her car on the day of the shooting.

Defendant's five-day jury trial took place in September 2023. The jury returned its verdict on September 29, 2023. The parties stipulated at trial that defendant had previously been convicted of a felony that met the definition of a "specified felony" for purposes of the felon-in-possession charges. Based upon the evidence at trial, the jury found defendant guilty as charged on all counts. Defendant now appeals his convictions, but not his sentences.

## II. LEGAL ANALYSIS

On appeal, defendant challenges his convictions on four grounds. First, he asserts that the prosecutor erred when he elicited testimony from Hunter about an agreement that Hunter had made

with the prosecutor's officer that required her to testify truthfully. Defendant claims that amounted to impermissible vouching for Hunter's credibility. Second, defendant insists that he was denied his right to a fair trial when the jury heard testimony indicating that defendant had been held in jail awaiting trial. Third, defendant argues that the trial court improperly modified the jury instruction set forth in M Crim JI 4.11. Finally, defendant contends that he received ineffective assistance of counsel because his defense attorney did not call certain alibi witnesses to testify at trial. We will address each argument in turn.

## A. VOUCHING FOR WITNESS CREDIBILITY

Defendant claims the prosecutor improperly vouched for Hunter's credibility by referring to her agreement with the prosecutor's office that required her to testify truthfully. The standard for judging prosecutorial misconduct "is whether the defendant was denied a fair and impartial trial (i.e., whether prejudice resulted)." *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). "[I]introduction of an accomplice's promise of truthfulness is not necessarily error[.]" *People v Enos*, 168 Mich App 490, 492; 425 NW2d 104 (1988). But introduction of such a promise "is error if used by the prosecutor to suggest that the government has some special knowledge that the witness is testifying truthfully." *Id*. In *Enos*, this Court concluded that "the prosecutor did not merely discuss the plea agreement containing the promise of truthfulness." *Id*. at 494. Rather, this Court found the prosecutor had "impermissibly used the agreement to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Id*. at 495. As a general rule, "[b]y calling a witness who testifies pursuant to an agreement requiring him to testify truthfully," the prosecution "does not insinuate possession of information not heard by the jury" and "cannot be taken as having expressed [a] personal opinion on a witness' veracity." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995).

Defendant acknowledges that he did not object to the identified testimony at trial, so this issue is unpreserved. This Court reviews all unpreserved claims of prosecutorial misconduct by deciding whether the claimed errors amounted to plain error affecting substantial rights. *People v Gibbs*, 299 Mich App 473, 482; 830 NW2d 821 (2013). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

Here, the prosecutor advised the jury in his opening statement that Hunter had been charged with accessory after the fact in connection with the shooting and she had entered into an agreement with the prosecutor's office to testify at trial. At the beginning of her testimony, Hunter also told the jury she had been charged with accessory after the fact in connection with the shooting and she had reached an agreement with the prosecutor's office. Later in the direct examination of Hunter, her agreement was discussed again. The exchange began when Hunter was providing details about the shooting. Hunter testified that she did not look back to see what was going on when she heard gunshots coming from behind her. In response to that answer, the prosecutor brought up Hunter's testimony from the preliminary examination, where she testified that she glanced back when she heard the gunshots. The prosecutor emphasized that during the preliminary examination, just like at trial, Hunter had taken an oath and had sworn to tell the truth. In addition, the prosecutor brought up the agreement that Hunter had reached with the prosecutor's office and said: "one of the things

that we've got as far as an agreement here with my office is that your agreement is to tell the truth in court, right?" Hunter responded, "Correct."

During that exchange, defense counsel objected, arguing that it was an improper refreshing of the witness's memory to read the preliminary examination transcript to the jury. The prosecutor responded that he was impeaching Hunter "with prior sworn testimony," and the trial court agreed with the prosecutor. Hunter eventually admitted she did not recall her testimony at the preliminary examination, but conceded that she probably did say that she glanced back. To complete that topic, the prosecutor then asked Hunter: "And you had, like we just went through, agreed to tell the truth, right?" Hunter responded, "Uh-hmm."

Defendant now contends that portions of that questioning were impermissible vouching for Hunter's credibility. On this unpreserved claim of error, defendant has not established that it was plain error to allow the jury to hear brief comments that Hunter had reached an agreement with the prosecutor to testify truthfully. A jury hearing about such an agreement is not necessarily error; it is only impermissible if the prosecutor suggests that the government has some special knowledge, not known to the jury, that the witness is testifying truthfully. *Enos*, 168 Mich App at 492. During the portion of the trial that included brief references to Hunter's agreement with the prosecutor's office requiring truthful testimony, the emphasis was on the oath Hunter took to testify truthfully at both the preliminary examination and the trial. At no time did the prosecutor use the agreement to suggest the government had some special knowledge, not known by the jury, that Hunter was testifying truthfully. See *id*. Because there was no suggestion of such special knowledge, nothing was impermissible about referring to Hunter's agreement. Moreover, defendant's contention that the prosecutor impermissibly bolstered Hunter's credibility during that exchange is belied by the prosecutor's statement that he was actually impeaching Hunter at that point in the trial. Therefore, plain error did not occur when the jury was permitted to hear references to the agreement between Hunter and the prosecutor's office.[1]

## B. EVIDENCE OF DEFENDANT'S PRETRIAL DETENTION

Next, defendant contends that he is entitled to a new trial because the jury heard testimony that defendant communicated with Hunter while he was in jail awaiting trial. Defendant concedes this issue was not preserved, so our review is limited to a search for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764.

"References to a defendant's prior incarceration are, unless specifically ruled otherwise, generally inadmissible." *People v Spencer*, 130 Mich App 527, 537; 343 NW2d 607 (1983). This Court has described evidence of the fact that a defendant has been in prison as "highly prejudicial." *Id*. at 536. Similarly, our Supreme Court has explained that the danger of informing a jury of prior

---

[1] Defendant suggests in passing that defense counsel was ineffective for failing to object to this testimony. Because this testimony was not objectionable, defense counsel was not ineffective for failing to object. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

convictions is that the jury might misuse the evidence "by focusing on the defendant's general bad character[.]" *People v Allen*, 429 Mich 558, 569; 420 NW2d 499 (1988).

Separately, this Court has addressed situations in which evidence was presented to the jury indicating that the defendant had been held in jail awaiting trial. "[B]ecause defendant will be on trial for a serious crime, the jury will already be aware that defendant at some point was arrested and in police custody." *People v Horton*, 341 Mich App 397, 405; 989 NW2d 885 (2022). The issue in *Horton* was the jury viewing a video of the preliminary examination in which defendant could be seen in jail garb. *Id*. at 402. The *Horton* Court concluded that the admission of that video at trial did not undermine the defendant's presumption of innocence in violation of his due-process rights. *Id*. This Court further noted that jailhouse interrogation videos are frequently admitted at criminal trials. *Id*. at 403. This Court distinguished the admission of such evidence from cases in which the defendant appeared for an entire trial wearing jail clothing because when the defendant wore jail garb throughout the trial, that clothing "would be a continuing influence throughout the trial." *Id*. at 402-403 (quotation marks and citation omitted).

This Court recently addressed a situation where a potential juror disclosed during voir dire that he worked at the county jail and had seen the defendant there. *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 19. This Court voiced concern that if the jurors learned that the defendant had been in jail, the defendant's "right to be presumed innocent would be affected because jurors might presuppose guilt from the fact the defendant was in jail." *Id*. at ___; slip op at 20, citing *Horton*, 341 Mich App at 504-505. This Court explained that the issue was similar to the issue in *Horton*, and concluded that "the brief statement regarding defendant being in jail did not affect the fairness of defendant's trial or undermine the presumption of innocence equivalent to being required to go through an entire trial dressed in jail garb." *Serges*, ___ Mich App at ___; slip op at 20.

Here, defendant contends his right to a fair trial was violated because there were references to defendant communicating with Hunter by methods inmates used, i.e., "J-Pay" or calling "using another inmate's pin." This case is similar to *Serges* because the issue is whether references to defendant being in jail awaiting trial denied defendant a fair trial. Just as in *Serges*, cases involving defendants wearing jail clothing at trial are not relevant to the instant case, which merely involves brief references to defendant's incarceration. *Id*.

In addition, although references to *prior* incarceration are generally inadmissible, *Spencer*, 130 Mich App at 537, this case involves detention while awaiting trial. Precedent discussing the reference to prior incarceration identifies the concern that the jury might misuse that evidence by focusing on the defendant's general bad character. *Allen*, 429 Mich at 569. Indeed, references to prior incarceration are tantamount to presenting evidence of prior convictions. But that concern is not present in a case like this, where defendant was detained in jail on the charges at issue at trial.

As in *Serges*, we determine that defendant's presumption of innocence was not violated, nor was he denied a fair trial, by brief references to his pretrial detention. This Court has previously noted that a jury considering allegations of a serious crime—such as murder—would already be aware that the defendant had been in police custody at some point. *Horton*, 341 Mich App at 405. This Court has previously rejected the argument that brief references to the defendant being in jail awaiting trial on the current charges violate the defendant's right to be presumed innocent because

jurors might presuppose guilt from the fact that the defendant was in jail. *Serges*, ___ Mich App at ___; slip op at 20. Consequently, defendant has failed to establish that he was deprived of a fair trial because of the brief references to his pretrial detention, and he has certainly failed to establish that plain error occurred.

## C. JURY INSTRUCTION

Next, defendant faults the trial court for furnishing the jury with a modified version of the instruction concerning other acts evidence, M Crim JI 4.11. We review de novo jury instruction issues that involve a question of law. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). "[A] trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *Id*. M Crim JI 4.11 addresses evidence presented to the jury that establishes that the defendant committed a crime for which he or she is not on trial, and states:

> (1) You have heard evidence that was introduced to show that the defendant committed [a crime / crimes / improper acts] for which [he / she] is not on trial.
>
> (2) If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show:
>
> > [Choose one or more from (a) through (g):]
> >
> > (a) That the defendant had a reason to commit the crime;
> >
> > (b) That the defendant specifically meant to _____;
> >
> > (c) That the defendant knew what the things found in [his / her] possession were;
> >
> > (d) That the defendant acted purposefully-that is, not by accident or mistake, or because [he / she] misjudged the situation;
> >
> > (e) That the defendant used a plan, system, or characteristic scheme that [he / she] has used before or since;
> >
> > (f) Who committed the crime that the defendant is charged with.
> >
> > (g) [State other proper purpose for which evidence is offered.]
>
> (3) You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that [he / she] is likely to commit crimes. You must not convict the defendant here because you think [he / she] is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime, or you must find [him / her] not guilty.

If a trial court commits error in its instructions, this Court "[w]ill not reverse where the jury instructions fairly presented the issued to be tried and sufficiently protected the defendant's rights."

*People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). Moreover, "jurors are presumed to follow the trial court's instructions[.]" *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

Here, the jurors heard evidence that defendant had committed other offenses for which he was not on trial. The parties stipulated that defendant had been convicted of a specified felony, a required element of the felon-in-possession charges. Defendant also insists that the testimony that he used another inmate's PIN while in jail to make a phone call to obstruct the murder investigation could be construed by the jury as evidence that he committed a criminal act. While describing the phone calls defendant made while in jail awaiting his trial, a police officer testified that defendant used other inmates' PINs to try to obstruct the investigation. The trial court provided the following cautionary instruction to the jury:

> You have heard evidence that was introduced to show that the Defendant committed a crime for which he is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about this evidence—I'm sorry—You may only think about whether this evidence tends to show that the Defendant was previously convicted of a specified felony for the purposes of counts three and/or four. You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the Defendant is a bad person or that he's likely to commit crimes. You must not convict the Defendant here because you think he's guilty of another bad act. All of the evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crime or you must find him not guilty.

We cannot tell what harm defendant believes could have come from that instruction or how that instruction could have been crafted to provide additional protection to defendant. The purpose of instructing the jury under M Crim JI 4.11 is clear. Although the jury was instructed on how to treat a stipulated fact, see M Crim JI 4.7, because that stipulated fact in this case was that defendant had a previous felony conviction, it was prudent to instruct the jurors that they could use that fact in resolving the felon-in-possession charges, but not in assessing defendant's propensity to commit crimes. The version of M Crim JI 4.11 that the trial court gave to the jury was broad, advising the jury that any evidence they heard that they believed showed that defendant had committed a crime for which he was not on trial could only be used for the purpose of determining whether defendant had previously been convicted of a specified felony as required by the felon-in-possession charges. To the extent that any jurors believed the testimony about defendant using another inmate's PIN was evidence that defendant committed a crime, that instruction prohibited the jury from using the information for any purpose other than proving that element of the felon-in-possession charges.[2]

---

[2] Defendant's counsel may have waived the issue of specifically addressing the PIN matter in that jury instruction. See *People v Hall (On Remand)*, 256 Mich App 674, 679; 671 NW2d 545 (2003). But regardless of that waiver, we note that M Crim JI 4.11, as read to the jury in this case, protected defendant to the extent that any jurors believed that the testimony about his use of another inmate's PIN established that defendant committed a crime for which he was not on trial. The jurors were

Defendant's contention that the trial court should have read M Crim JI 4.11 "in its entirety" defies logic. M Crim JI 4.11 has 3 sections. The trial court read sections 1 and 3 in their entirety. See M Crim JI 4.11(1) and (3). Section 2 consists of 7 subsections, and the instruction states that "one or more" of the subsections should be chosen. M Crim JI 4.11(2). The trial court only read subsection (g), which is a provision that permits the trial court to craft a specific purpose for that case. M Crim JI 4.11(2)(g) ("State other proper purpose for which evidence is offered."). As a result, the only portions of M Crim JI 4.11 that were not read to the jury were subsections (2)(a) through (f), which have no relevance to this case. For example, M Crim JI 4.11(2)(c) instructs the jurors that they "may only think about whether this evidence tends to show . . . [t]hat the defendant knew what the things found in [his / her] possession were[.]" Defendant has failed to explain how the omitted subsections of M Crim JI 4.11 had any bearing on his case.

Simply put, to the extent that the jury construed any evidence to show that defendant had committed a crime for which he was not on trial, the instruction sufficiently protected defendant's rights. See *Eisen*, 296 Mich App at 330. The instruction given to the jurors prohibited them from using such evidence for propensity purposes. The jury could only use that evidence for the purpose of establishing that defendant had been convicted of a specified felony for the felon-in-possession charges, and the parties stipulated that defendant had been convicted of a specified felony. Thus, defendant has failed to establish that the instruction given by the trial court was plain error affecting his substantial rights.

## D. ALIBI WITNESSES

Finally, defendant contends he received ineffective assistance because his defense counsel did not call certain alibi witnesses to testify. Whether a defendant has been deprived of effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings are reviewed only for clear error, but its constitutional determinations are reviewed de novo. *Id*. "Clear error" exists if "the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted). Because no *Ginther* hearing took place, our review is limited to errors that are apparent on the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

To prevail on his claim of ineffective assistance of counsel, "defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome [of the trial] would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). The effective assistance of counsel "is presumed, and the defendant bears a heavy burden to prove otherwise." *People v Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005). Therefore, the defendant "must

---

instructed that they could only use that evidence for the purpose of establishing that defendant had been convicted of a specified felony to satisfy an element of the felon-in-possession charges. The parties stipulated that defendant had been convicted of a specified felony. Hence, even if the jury concluded that the testimony of the PIN usage was evidence that defendant committed a crime, that evidence would be cumulative to the stipulated fact, so it would have no bearing on either the felon-in-possession convictions or the other convictions.

overcome the strong presumption that defense counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

Decisions concerning whether to call witnesses are presumed to be matters of trial strategy. *Id*. at 76. If a claim of ineffective assistance is based on an attorney's failure to call an alibi witness, the defendant must establish that the witness would have provided favorable testimony. *People v Pickens*, 446 Mich 298, 327; 521 NW2d 797 (1994). In addition, defendant "bears the burden of establishing the factual predicate for his claim." *People v Putnam*, 309 Mich App 240, 248; 870 NW2d 593 (2015) (quotation marks and citation omitted).

Here, the lower-court record contains no evidence whatsoever about any alibi witnesses, the content of their expected testimony, or why defense counsel did not call them to testify at trial. Defendant insists that defense counsel failed to investigate and interview witnesses, failed to obtain statements and contact information for those witnesses, and failed to serve the witnesses with trial subpoenas. But defendant provides no citation to the lower court record to demonstrate what steps defense counsel did, or did not, take with respect to the witnesses that could establish that defense counsel's actions were constitutionally deficient. Therefore, defendant has failed to overcome the strong presumption that not calling any alibi witnesses was sound trial strategy. *Trakhtenberg*, 493 Mich at 52. Additionally, by failing to establish that the witnesses would have provided favorable testimony, defendant failed to demonstrate that his substantial rights were affected by the omission of alibi testimony.

Defendant attempts to support his claim on appeal by submitting to this Court a list of five purported alibi witnesses and a one-paragraph summary of what they would have said if called to testify at trial. But we cannot consider that document because it is not contained in the lower-court record.[3] See *Payne*, 285 Mich App at 188. As a result, defendant cannot establish that he received ineffective assistance of counsel based on his trial counsel's failure to call alibi witnesses at trial.

Affirmed.

/s/ Christopher P. Yates
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney

---

[3] Even if this Court considers the substance of the document, the facts asserted in the summary do not provide an alibi for defendant, so the document fails to establish that the witnesses would have provided favorable testimony. See *Pickens*, 446 Mich at 327. The witness summary merely states that a party was held between the hours of 1:20 p.m. and 4:30 p.m. on the day of the shooting. But the evidence indicated that the shooting was completed by 12:52 p.m., and the shooting took place less than three miles away from the location of the party. Therefore, the proposed testimony does not provide an alibi to defendant at the time the shooting occurred. Moreover, the summary merely asserts that defendant attended the party. It does not say that he was there the whole time, nor does it specify what time he was at the party.

-10-